MOM'S, INC.; John Robert Colaprete; Theodore Mazur Bonk; Edy Miller; Jennifer Marie Miller, a minor by Edy Miller, her parent and next friend; Richard Scott Miller II, a minor by Edy Miller, his parent and next friend; and Richard Scott Miller, Plaintiffs,

v.

JUDITH WEBER, individually and as Special Agent for the Department of Alcoholic Beverage Control of Virginia; Clyde Santana, individually and as Special Agent for the Department of Alcoholic Beverage Control of Virginia; Bob Dunford, individually and as Special Agent for the Department of Alcoholic Beverage Control of Virginia; City of Virginia Beach; City of Norfolk; Unknown Federal Agents; Unknown State Agents; Unknown City of Virginia Beach Agents; Unknown City of Norfolk Agents; United States of America; Cheryl L. Kast, individually and as Group Manager for the Internal Revenue Service; John C. McDougal, individually and as Special Litigation Assistant for the Internal Revenue Service; Carol E. Willman, individually and as Special Agent for the Internal Revenue Service; Robert E. Burgess, individually and as Special Agent for the Internal Revenue Service; Arlene T. Campsen, individually and as Special Agent for the Internal Revenue Service; Timothy Daruk, individually and as Special Agent for the Internal Revenue Service; Michael E. Dunlow, individually and as Special Agent for the Internal Revenue Service; Donna L. Eason, individually and as Tax Fraud Investigative Aide for the Internal Revenue Service; George T. Overstreet, individually and as Special Agent for the Internal Revenue Service; John Brink, individually and as Special Agent for the Internal Revenue Service; Leslie L. Lilley; Dave Altman, individually and as Special Agent for the Department of Alcoholic Beverage Control of Virginia; Daryl Ware, individually and as Special Agent for the Department of Alcoholic Beverage Control of Virginia; James Edwards, individually and as Special Agent for the Department of Alcoholic Beverage Control of Virginia; Roger Warren, individually and as Special Agent for the Department of Alcoholic Beverage Control of Virginia; David Huff, individually and as Special Agent for the Department of Alcoholic Beverage Control of Virginia; Craig Carmen, individually and as Special Agent for the Department of Alcoholic Beverage Control of Virginia; Joyce Sutton, individually and as Special Agent for the Department of Alcoholic Beverage Control of Virginia; Leon Coleman, individually and as Special Agent for the Department of Alcoholic Beverage Control of Virginia; David Libengood,

individually and as Special Agent for the Department of Alcoholic Beverage Control of Virginia; and Bobby Bass, individually and as Special Agent for the Department of Alcoholic Beverage Control of Virginia, Defendants.

No. CIV.A. 2:96cv246.

United States District Court,
E.D. Virginia.
Norfolk Division.

Jan. 13, 2000.

Robert John Haddad, Shuttleworth, Ruloff & Giordano, Virginia Beach, VA, James Calvin Breeden, Hubbard, Breeden & Terry, Irvington, VA, Alan W. Clark, Chassell, MI, Kenneth William Stolle, Bennett & Stolle, Virginia Beach, VA, for plaintiffs.

John Patrick Griffin, Office of the Attorney General, Richmond, VA, Michael King Jackson, Office of the Attorney General, Richmond, VA, James Stuart Gilmore, III, Hon., Attorney General of Virginia, Richmond, VA, for Judith Weber, Clyde Santana, Bob Dunford, Daryl Ware, James Edwards, Roger Warren, Joyce Sutton, Leon Coleman, David Libengood, Bobby Bass, defendants.

John Patrick Griffin, Office of the Attorney General, Richmond, VA, Michael King Jackson, Office of the Attorney General, Richmond, VA, James Stuart Gilmore, III, Hon., Attorney General of Virginia, Lawrence R. Leonard, Thomas Holderness, Angelo Frattarelli, Richmond, VA, for Internal Revenue Service, defendant.

Jonathan Jackel, U.S. Department of Justice, Trial Attorney, Tax Division, Stuart D. Gibson, U.S. Dept. of Justice, Washington, DC, Lawrence R. Leonard, James Stuart Gilmore, III, Hon., Attorney General of Virginia, Richmond, VA, for U.S., defendant.

George Walerian Chabalewski, Office of the Attorney General, John Patrick Griffin, Office of the Attorney General, Michael King Jackson, Office of the Attorney General, Richmond, VA, Thomas Holderness, U.S. Department of Justice, Angelo Frattarelli, U.S. Department of Justice, Washington, DC, for Dave Altman, Craig Carmen, David Huff, defendants.

Jonathan Jackel, U.S. Department of Justice, Trial Attorney, Tax Division, Lawrence R. Leonard, Thomas Holderness, Angelo Frattarelli, Richmond, VA, for Donna L. Eason, George T. Overstreet, John Brink, Arlene T. Campsen, Timothy Daruk, Michael E. Dunlow, Carol E. Willman, Robert E. Burgess, Cheryl L. Kast, John C. McDougal, defendants.

### *ORDER*

DOUMAR, District Judge.

Presently before the Court are two Motions for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56(c). Internal Revenue Service ("IRS") agents Carol Willman ("Willman") and Cheryl Kast ("Kast") filed a joint Motion for Summary Judgment claiming immunity from suit. In addition, the three remaining state defendants in this case, Virginia Alcohol Beverage Control ("ABC") Board agents Clyde Santana, ("Santana"), Robert Dunford, ("Dunford"), and Dave Altman, ("Altman"), filed a joint Motion for Summary Judgment also claiming immunity from suit. For the reasons outlined below, the Motions for Summary Judgment are **GRANTED IN PART** and **DENIED IN PART**.

Before beginning a discussion of the issues, it is incumbent upon the Court to clarify exactly what this case is, and what it is not. This case is not a tort case. The issue of the negligence of the ABC and IRS defendants is not before the Court in the sense of a typical negligence action. Plaintiffs' failure to comply with the requirements of the Federal Tort Claims Act has prohibited them from bringing suit against the agencies or individual defen-

dants based solely on their negligence. This case concerns whether Defendants violated the Plaintiffs' constitutional rights in procuring search warrants for Plaintiffs' homes and business. Insofar as Plaintiffs' constitutional claims are concerned, Defendants can claim immunity from suit for acts committed during the course of official duties if a reasonable investigating officer in Defendants' positions would have believed that those acts did not violate the United States Constitution. Defendants moved for summary judgment on these grounds. Such a motion entitles Defendants to an early adjudication as to whether or not they are immune from suit for their alleged violation of Plaintiffs' constitutional rights.

Although it may be clear that Plaintiffs' constitutional rights to be free from unreasonable search and seizure were indeed violated, and that the agencies involved were engaged in grossly negligent and possibly malicious conduct, that does not necessarily mean that any one particular defendant knew or reasonably should have known that his or her actions violated the United States Constitution. Thus, it is possible that no one defendant may be subject to suit even though the entire group of defendants acting as a whole may have clearly committed constitutional violations. Moreover, even if immunity is not granted to any one individual defendant, this does not necessarily mean that such person is liable to any plaintiff. It merely indicates that such individual would be required to face a trial by jury to determine

if that person is liable to any one or more of the plaintiffs. Thus, the question facing the Court is whether any one or more of the plaintiffs is entitled to a jury trial against any one or more of the defendants.[1]

## I. PROCEDURAL AND FACTUAL BACKGROUND [2]

The major plaintiff in this case is Mom's Inc. ("Mom's"), a Virginia corporation now operating several restaurants in the Tidewater, Virginia[3] area under the name "The Jewish Mother." At the time the underlying facts arose, Mom's was licensed by the ABC to operate only one restaurant located in Virginia Beach, Virginia. The owners of Mom's were also operating a restaurant in Norfolk, Virginia that was licensed in the name of Donaline Corporation ("Donaline").[4] Prior to becoming involved with the Norfolk restaurant, Mom's was a "mom and pop" operation.[5] The other plaintiffs include Mom's principal shareholders Theodore Bonk ("Bonk") and John Colaprete ("Colaprete"), Jewish Mother manager Richard Scott Miller ("Miller"), his wife Edy Miller, and Miller's two children, Richard Scott Miller, II and Jennifer Marie Miller. This action arises out of searches conducted at The Jewish Mother restaurants operated by Mom's in Norfolk and Virginia Beach, as well as searches conducted at the personal residences of plaintiffs Colaprete and Miller, on April 2, 1994. The searches were conducted by IRS and ABC agents pursuant to warrants authorized by United States

1. There are reams of material in this case. In addition, witness statements rather than affidavits or depositions are sometimes utilized by counsel, requiring the Court to look to the source. However, the Court has endeavored to look at all of the material.

2. Because this case is before the Court on Defendants' Motions for Summary Judgment, the facts are viewed in a light most favorable to Plaintiffs.

3. The Tidewater, Virginia area would certainly encompass the ABC's Chesapeake, Virginia office and would probably include the Hampton Roads metropolitan area. This would in-

clude the cities of Chesapeake, Hampton, Newport News, Norfolk, Portsmouth, Suffolk, Virginia Beach, Williamsburg, and Counties of Isle of Wight, James City and York. As a whole, it would comprise a little over one million people.

4. As will be seen below, Mom's owners began operating the restaurant location licensed to Donaline in Norfolk under the name "The Jewish Mother" in December 1993. Prior to that, the only location was in Virginia Beach.

5. As described in the affidavit in support of the search warrants in this case.

Magistrate Judge Tommy Miller requiring the IRS to search the premises for certain items. Defendants, which include ABC and IRS agents, are accused of violating Plaintiffs' constitutional civil rights in obtaining the warrants. Specifically, Plaintiffs claim that the affidavit submitted to the magistrate in support of the search warrants contained misrepresentations and omitted certain salient facts, and that Defendants failed to investigate the situation prior to seeking the warrants, which the investigating officers reasonably should have known violated Plaintiffs' constitutional rights. The basis of those alleged misrepresentations, and the claim that Defendants failed to adequately investigate the situation prior to seeking the warrants, centers around Defendants' use of information provided by an informant named Deborah Shofner ("Shofner").

The record clearly indicates that misrepresentations were made in the affidavit in support of the search warrants. How and why these misrepresentations came about, and whether the individuals involved knew or reasonably should have known that Plaintiffs' constitutional rights were being violated is the main issue before the Court. Plaintiff John Colaprete also claims that Defendants are liable for taking his gold watch during the search of his home and depriving him of the companionship of his dogs by altering their demeanor.

The claims against the IRS defendants are brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), which allows a plaintiff to seek monetary damages from federal governmental officials who have violated his constitutional rights. The claims against the ABC defendants are brought pursuant to 42 U.S.C. § 1983. Plaintiffs seek $20 million in both compensatory and exemplary damages.

Plaintiffs filed this action, which originally included tort claims, on March 3, 1996. The United States was substituted for the individual federal employees as the proper defendant for the tort claims on December 26, 1996. The tort claims were subsequently dismissed for failure to comply with the filing requirements of the Federal Tort Claims Act. Plaintiffs also voluntarily dismissed seventeen individual defendants after conducting discovery and realizing that those defendants were not liable for constitutional violations. That left as defendants IRS agents Arlene Campsen ("Campsen"), Willman, and Kast, and ABC agents Dunford, Altman, and Santana. On May 14, 1999, IRS defendant Campsen filed a motion for summary judgment. On that same day, IRS defendants Kast and Willman filed a joint motion for summary judgment. ABC defendants Dunford, Santana, and Altman followed with their own joint motion for summary judgment on May 17, 1999. Both the ABC and IRS defendants base their motions for summary judgment on the issue of immunity. The Court heard oral argument on the motions on June 16, 1999. After hearing argument on the motions and reviewing the parties' briefs and numerous depositions filed in the record, on July 1, 1999, the Court granted Campsen's motion for summary judgment. However, the Court did not rule on the other motions for summary judgment, and instead, held an evidentiary hearing at which sixteen witnesses testified on September 15, October 7, October 8, and October 12, 1999, in order to resolve the issues presented by those motions. In light of all the evidence, the parties then submitted further memoranda on the issue of Defendants' immunity. The motions for summary judgment based on immunity from suit are now ripe for decision.

## A. Background

The original Jewish Mother restaurant is a moderately priced restaurant, owned and operated by Mom's, located just off the oceanfront on Pacific Avenue in Virginia Beach, Virginia. The restaurant, which advertises itself as a New York-style delicatessen, is open twelve months of the year and serves breakfast, lunch, and dinner. Of particular concern to this case is the operation of the restaurant from 1990

through 1994. During that time, the restaurant seated between 189 and 216 people.[6] The average bill per person at the restaurant commonly fell in the $10 to $15 range.[7] In addition to meals, the Virginia Beach Jewish Mother often provided live music from local and sometimes nationally-known bands. On nights when a band was playing, the restaurant sometimes required that patrons pay a cover charge to gain admittance. The cover charge was usually between two and three dollars. (E.H. Tr., Vol. II at 342.)[8] However, cover charges could range as high as ten dollars on nights when a nationally-known band was playing. (Id.) Even when a band was playing, some guests could be admitted without paying a cover charge by entering the establishment for dinner prior to the start of the performance, and then remaining in the restaurant for the performance. (Id. at 345.) According to David Giesen ("Giesen"), a bookkeeper at The Jewish Mother in Virginia Beach from October 1992 to September 1993, the restaurant usually collected thirty to one hundred dollars in cover charges on nights when a local band was playing. (See E.H. Ex. Vol. II, tab KW3.)

The events which gave rise to the search of the Virginia Beach Jewish Mother restaurant on April 2, 1994, and ultimately to this litigation, began well before the search warrants were executed. As a restaurant licensed to sell alcoholic beverages in the Commonwealth of Virginia, The Jewish Mother was required by law to file a Mixed Beverage Annual Review ("MBAR")[9] with the ABC. In 1992, the person responsible for filing the tax returns and MBARs for The Jewish Mother was Don Robey ("Robey"). Robey had been employed by The Jewish Mother for some time prior to 1992. (E.H. Tr., Vol. III at 511–12.) In 1993, David Giesen signed the MBAR for reporting year 1992–1993.[10] In late 1992 or early 1993, The Jewish Mother hired a certified public accountant ("CPA") named D.B. Gray

6. At oral argument, counsel informed the Court that the Virginia Beach Jewish Mother seated approximately 189 people. According to Mixed Beverage Annual Reviews filed with the ABC, in 1992 the restaurant seated 216 people and in 1993 the restaurant seated 210 people.

7. According to Norfolk police detective Stephan Bennis, the "expert" ABC defendant Dunford relied on in conducting an analysis of The Jewish Mother's finances as will be discussed below, the average bill was $10 to $12 per person or $20 to $30 per table depending on the number of guests. (E.H. Tr., Vol. II at 341–42.)

8. Throughout this Order, the citation abbreviation "E.H. Tr." will refer to the transcript of the Court's evidentiary hearing on the motions for summary judgment held September 15, October 7, October 8, and October 12, 1999. The citation abbreviation "E.H. Ex. Vol." will be used to refer to the three exhibit volumes prepared for the evidentiary hearing by the parties per the Court's July 9, 1999 Order. The citation abbreviation "E.H. Ex. Vol." will be used to refer to those exhibits introduced at the evidentiary hearing that were not Court-ordered.

9. The MBAR is a form upon which an ABC-licensed restaurant reports its monthly purchases and sales. Purchases and sales are broken down into four categories: (1) food and non-alcoholic beverages; (2) mixed beverages; (3) wine and beer sales; and (4) miscellaneous. MBAR reports must be filed with the ABC yearly based on the date the license was issued, not on a calendar-year basis. The Jewish Mother was required to file a yearly MBAR for a time period running from February of one year to January of the next.

10. Giesen was a bookkeeper for approximately 11 months at The Jewish Mother in Virginia Beach, from October 1992 to September 1993. (E.H. Ex. Vol. II, tab KW3.) According to Giesen, during the time he was employed there, The Jewish Mother's "books were horrible, and non-existent." (Id.) Giesen stated that "Pat Moscoffian did the books mostly at home and that she did the bare minimum." (Id.) Moscoffian continued to work for The Jewish Mother for three or four months after Giesen was hired. (Id.) The accountant for The Jewish Mother at that time was Donald Robey, and work was sent to him on a regular basis. (Id.) In an interview with Agents J.A. Weber and Clyde Santana of the ABC on December 1, 1994, Giesen originally stated that the numbers reported on the 1992 MBAR which he signed "came out of the air." (Id.) Explaining this in the same interview, Giesen told Weber and Santana that he used "cash register tapes and the ledger that Pat Moscof-

("Gray") to replace Robey. In addition to handling MBAR and tax return filings, Gray was retained to handle payroll and the payment of sales taxes for The Jewish Mother. (*Id.* at 497.) Shortly after he was hired, Gray discovered that Robey had failed to file The Jewish Mother's federal tax returns for 1989, 1990, and 1991. (*Id.* at 497–98.) Gray wrote the IRS asking for copies of the returns for those years, which Robey was supposed to have filed, but the IRS indicated that it had not received those tax returns from The Jewish Mother. (*Id.* at 512, 514–15.) Gray immediately began working to file these past due returns, but this task was made difficult by the fact that Robey still had possession of many important records necessary for filing the returns, and he only returned those records to The Jewish Mother piece by piece over a long period of time. (*Id.* at 512–13.) Gray and an associate spent most of 1993 preparing the overdue returns, filing the 1992 return, and keeping up with the information that would be necessary for filing The Jewish Mother's 1993 return. (*Id.* at 499.) During this time, Gray's main contact at The Jewish Mother was bookkeeper David Giesen. (*Id.* at 500.)

The late returns were finally filed in September 1993. (*Id.* at 516.) Subsequently sometime in October or November 1993, Gray was introduced to Deborah Shofner, The Jewish Mother's new bookkeeper, and was told that she was going to help with The Jewish Mother's financial records. (*Id.* at 500.) Shofner had originally been hired as a deli clerk for The Jewish Mother's Virginia Beach location just a few weeks prior to being promoted to bookkeeper. (Colaprete Dep. at 58, 67.) In her statements to the investigators seeking search warrants in this case, Shofner stated that she started work in October 1993 and worked in the deli for a couple of weeks and then was promoted to bookkeeper. (Bennis Dep. at 28.) According to the information obtained by someone involved in the investigation that led to the searches in this case, at the time she was hired Shofner had a prior conviction for credit card fraud and was on parole under the guidance of a federal probation officer.[11] Neither Colaprete nor Bonk were aware of this fact when they hired her. Soon after meeting Gray, Shofner complained to Gray about the penalties The Jewish Mother was being assessed by the IRS because of the late tax return filings for the years up to 1993. (E.H. Tr., Vol. III at 501.)

Prior to the time Shofner was hired by Mom's, and during the time Gray was working to put The Jewish Mother's financial records in order in 1993, the IRS and the ABC had a program in place by which they shared information in an effort to identify restaurants that were under-reporting sales and income. (E.H. Tr., Vol. II at 9.) The two agencies had successfully worked together on a previous case.[12] Un-

fian kept to prepare" the 1992 MBAR report, and that "most of the numbers on the report came from her ledger." (*Id.*) Giesen told Santana and Weber that the numbers on the 1992 MBAR for mixed beverages and wine and beer sales were not correct because "the cash registers wold put some beer sales in the mixed beverage departments." (*Id.*) To fix this problem, in 1993 Giesen had the cash register company reprogram the cash registers so that the beer sales would be correctly reported. (*Id.*)

11. In actuality, according to court records, Shofner had been convicted of uttering worthless checks in 1982, grand theft in 1989, and a federal offense of use of an unauthorized access device in 1992, for which she was currently on parole having presently been returned to prison for a prior violation of parole. As noted above, Shofner was the Defendants' primary source of information in seeking search warrants in this case, and thus, although she is not a party, Shofner played a significant role in the events leading up to this litigation. According to testimony at the evidentiary hearing, Shofner was a very persuasive individual and an excellent liar. As will become apparent below, she managed to fool not only the Mom's principals, but also the ABC and the IRS.

12. That case concerned the operations of Nabil Kassir. Kassir operated several restaurants and tourist attractions in Virginia Beach where millions of dollars of alleged skimming

der the information sharing program, the ABC agreed to send the IRS copies of MBARs for Tidewater restaurants that appeared, based on the MBARs, to have the highest potential for under-reporting. (E.H. Tr., Vol. II at 10.) In exchange, the IRS promised to share the results of its investigations with the ABC. (*Id.* at 10.) IRS agent Tom Ryan ("Ryan") was working on the project with defendant Dave Altman of the ABC. (*Id.* at 14.) According to ABC defendant Dunford, the ABC would input all the information from the MBARs into a computer, which would then automatically calculate a markup percentage. (Dunford Dep. at 8.) The computer program would then indicate based on the markup percentage which restaurants were most likely under-reporting. (E.H. Tr., Vol. I at 64–65.) In July 1993, the IRS requested that the ABC send it MBARs for the eight worst offenders in the Tidewater, Virginia area. Using its computer program, the ABC selected an initial batch of eight MBARs from the Tidewater, Virginia area that showed the greatest likelihood of being under-reported and forwarded them to the IRS. (E.H. Tr., Vol. II at 10.) This initial batch did not include any MBARs from The Jewish Mother. Upon receipt, the IRS ordered tax returns from its Philadelphia Service Center for the restaurants represented in the MBARs. (*Id.* at 10.) Using those two documents, the IRS performed an analysis to determine whether it wanted to conduct an audit of any of the eight restaurants. (*Id.* at 10–11.) In September 1993, again at the request of the IRS, using its computer program the ABC selected a second batch of the eight worst MBARs from the Tidewater, Virginia area that appeared to be under-reported and forwarded them to the IRS. (*Id.* at 11.) The Jewish Mother's MBARs were not included in this batch either. Apparently, in July and September 1993, according to the ABC's computer program and those reviewing the results, The Jewish Mother's MBAR was not one of the sixteen worst MBARs in the Tide-

water, Virginia region with regard to potential under-reporting.

Nevertheless, the IRS eventually received a copy of The Jewish Mother's MBAR. A dispute exists over how this came to pass. According to IRS agent Ryan, on October 12, 1993, after Gray filed The Jewish Mother's late tax returns, Ryan specifically asked Altman to send him a copy of The Jewish Mother's 1991 and 1992 MBARs. (*Id.* at 14–15.) Ryan claims that The Jewish Mother came to his attention and he therefore requested the MBARs because he had received information that The Jewish Mother potentially had not timely filed a tax return for the 1991 tax year. (*Id.* at 16.) Ryan received the MBARs he requested from the ABC sometime in November 1993. (*Id.* at 19.)

Contrary to Agent Ryan's account, Agent Dunford of the ABC contends that he sent four MBARs from The Jewish Mother to the IRS in October 1993 pursuant to the sharing agreement, after the ABC identified the restaurant as a potential under-reporter. ABC defendant Dunford specifically claims that he conducted an analysis of the Virginia Beach Jewish Mother's MBARs in October 1993 and identified The Jewish Mother as a potential under-reporter at that time. There is no correspondence to support Dunford's contention, but Ryan referred to his contemporaneous notes in which he specifically reported requesting the two MBARs and receiving the two that he requested. A jury could easily find that the only reason the MBARs were sent to the IRS in October 1993 was because IRS agent Ryan specifically requested them. In addition, a jury could find that Dunford and the ABC had not conducted an analysis of The Jewish Mother's MBARs and thus, had not independently determined that the MBARs of the Virginia Beach Jewish Mother were under-reported · by October 1993. Furthermore, a jury could find that no such determination was made until after Deborah Shofner contacted the ABC in

was involved. The ABC and IRS investigated Kassir for one year before proceeding to se-

cure warrants in that case. (E.H. Tr., Vol. I at 31–32.)

January 1994, as will be discussed further below.

While Gray was getting The Jewish Mother's books and filings in order and IRS agent Ryan was requesting The Jewish Mother's MBARs, Mom's, under the direction of Bonk and Colaprete, was looking to open a second Jewish Mother restaurant in the city of Norfolk, Virginia. Sometime in the later half of 1993, Mom's began negotiations with Donaline, Inc. ("Donaline") for the purchase of a location at 5215 Colley Avenue ("Colley Avenue location") in Norfolk. Donaline owned the business and had been operating a restaurant there under the name "Colley Bay Café" since October 1992, although the location was closed during most of October and November 1993. (E.H. Tr., Vol. III at 729.)

The two principal shareholders of Donaline were Donald Berger ("Berger") and George Lineberry ("Lineberry").[13] Lineberry was well-known among those involved in the Tidewater restaurant business. In fact, it appeared that he had connections with most every tavern in the Norfolk area through another business he owned, Southern Amusements. (E.H. Tr., Vol. II at 307.) Through Southern Amusements, Lineberry provided a great number of amusements such as pool tables and video games to restaurants and bars throughout the Tidewater region. Essentially, Lineberry would lend money to the establishments he serviced through Southern Amusements and in exchange the owners would allow him to place Southern Amusements' pool tables or video machines in the establishments and collect a portion of the proceeds of those amusements to pay back the note on the loan. (E.H. Tr., Vol. III at 725.) Consequently, Lineberry had mortgages on a number of establishments in the Tidewater region. This position enabled Lineberry to learn about the availability of various restaurants in the area as they came up for sale. (*Id.*) If a particular restaurant he was involved with was unable to pay, occasionally Lineberry would take over the establishment and then try to sell it to someone else. (E.H. Tr., Vol. II at 308.) All of this was well known to the Norfolk police and those in the Tidewater restaurant and tavern business. (*Id.*)

To facilitate dealings with Lineberry and Berger in the purchase of the Colley Avenue location from Donaline, and the dealings with the ABC that such a sale would necessitate, Mom's hired attorney Sullivan Callahan ("Callahan"). Callahan was acquainted with Lineberry and Berger and was a law associate of then Speaker of the Virginia House of Delegates Tom Moss.[14] At first, Mom's owners Bonk and Colaprete approached Callahan with the idea of structuring a complete purchase of Donaline's stock by Mom's. (E.H. Tr., Vol. III at 725–26.) But Callahan, who had also represented Berger at one time in the acquisition of a restaurant and an ABC license, was concerned that there would be some unforeseen problems associated with Donaline.[15] (*Id.* at 725–26.) Callahan discouraged Bonk and Colaprete from acquiring Donaline's stock and instead encouraged them to form a new corporation and

---

**13.** Donaline is a composite of Donald and Lineberry.

**14.** Unfortunately, the contract court reporter at the evidentiary hearing typed the name "Lawless" instead of the name "Moss" into the record.

**15.** As it turned out, Callahan's intuition was correct—the Colley Avenue location had financial troubles of its own. Donaline's ABC license for the Colley Avenue location was issued in October 1992. (Santana Aff. ¶ 11.) The restaurant had been closed most of October 1993, a year after the license was issued, and all of November 1993 because it was not doing well. (E.H. Tr., Vol. III at 729, 735.) In addition, apparently the person running the restaurant for Donaline had not been keeping proper financial records, and therefore, there had been some problems with the restaurant's recent MBAR reports which were not filed. (*Id.* at 735.) Donaline had also failed to pay sales taxes on the Colley Avenue location from October 1992 to December 1993. (E.H. Tr., Vol. IV at 785.) Nevertheless, up to December 1993 the ABC had not issued any warnings or taken any action against Donaline or Lineberry or Berger.

to obtain a new ABC license for the establishment. (*Id.* · at 725–26.) In order to allow Mom's to begin operating at the Colley Avenue location while they were in the process of completing the purchase and obtaining a new ABC license, Callahan drafted a management agreement to be executed by Mom's and Donaline. (*Id.* at 726.) The management agreement provided that Donaline would hire Mom's to operate the location while Mom's secured its own ABC license. (E.H. Ex. Vol. I, tab 4.) After drafting the management agreement, on December 10, 1993 Callahan gave it to Deborah Shofner, who had been introduced to him as Mom's business manager. (E.H. Tr., Vol. III at 726, 737.) According to Callahan, Shofner was to have the management agreement signed by both parties and then return it to Callahan. Meanwhile, attorney A.J. Kalfus, who represented Berger and Lineberry, had drafted a sales agreement and forwarded it to the attorneys for Bonk by a letter dated December 8, 1993. (E.H. Ex. Vol. I, tab 4.)

Unfortunately for Bonk and Colaprete, by the time they were planning to reopen the Colley Avenue location, the ABC had also become interested in the location. In 1993 and 1994, ABC defendant Clyde Santana was a Special Agent with the ABC assigned to the Chesapeake, Virginia office. (E.H. Tr., Vol. IV at 760.) His jurisdiction included overseeing certain restaurants in the downtown Norfolk area, including the Colley Avenue location. (*Id.* at 761.) Callahan and Santana knew each other, and had interacted on many prior occasions with regard to ABC matters concerning other establishments. (E.H. Tr., Vol. III at 728.) Around December

7th or 8th of 1993, Callahan told Santana that the Mom's owners had taken possession of the Colley Avenue location "for a deal they couldn't refuse." (Santana Dep. at 8; E.H. Tr., Vol. IV at 762.) Hearing that Mom's had acquired the Colley Avenue location from Donaline apparently raised some concerns for Santana about Mom's qualifications to operate a restaurant at the location. (Santana Dep. at 12, 13.) According to Santana, the Colley Avenue location had been under investigation since October 25, 1993 for failing to pay sales taxes while it was still being operated as the "Colley Bay Café" by Donaline. (Santana Dep. at 14.)

On December 15, 1993, Bonk and Colaprete reopened the Colley Avenue location under what they thought to be a valid management agreement with Donaline.[16] On the day of the reopening, agent Santana visited the restaurant. (Bonk Dep. at 25.) There he met Bonk for the first time and informed him that Donaline had been under investigation for failing to pay sales taxes. (Bonk Dep. at 123; Santana Dep. at 16.) Bonk told Santana that Mom's did not have a lease for the location, and that Mom's was operating at the location pursuant to a management agreement with Donaline. (Santana Dep. at 20; Santana Aff. ¶ 16.) Santana asked to see a copy of the management agreement, but Bonk told him he did not have one at that time. (Santana Aff. ¶ 16.) Santana then issued a written warning to Donaline on grounds that it had not met ABC regulations for monthly food sales for a mixed beverage license holder for May through November 1993.[17] (Santana Aff. Ex. 2.) Bonk accepted and signed the warning on behalf of

---

16. In reality, according to a statement made by Berger to Santana, there was no management agreement because Shofner had forged Berger's signature.

17. In order for a person or other entity to sell alcoholic beverages in the Commonwealth of Virginia, among other requirements, that person or entity must comply with the following ABC regulations:

(a) own the property; have a lease on the location where alcoholic beverages will be

sold; or have an ABC approved management agreement with the entity licensed to sell alcoholic beverages;

(b) conform to the requirements of the governing body of the city, county, or other locality in which such place is located;

(c) have a tax number issued by the Commonwealth of Virginia and the United States;

(d) provide ABC with identifying information on all individuals having the status of corporate officer, director, or owner of stock,

Donaline. (*Id.*) At all times Bonk was under the assumption that they were operating under a management agreement.[18] The warning issued to Donaline was not the responsibility of Bonk or Mom's, but that of Berger and Lineberry.[19]

Meanwhile, the underlying sale of the Colley Avenue location was not going smoothly. (E.H. Tr., Vol. III at 727.) In Callahan's opinion, Berger was trying to get more money from Bonk and Colaprete out of the sale of the Colley Avenue location by threatening to surrender Donaline's ABC license to the ABC.[20] (*Id.* at 731–32.) Shortly after Bonk and Colaprete began operating at the Colley Avenue location on December 15, 1993, Berger called Santana and left a message request-

ing that Santana go to the Colley Avenue location and retrieve Donaline's ABC license. (Santana Dep. at 28, 29.) Berger told Santana that he did not want to get the license himself because he was worried that if he went to the location, some words might be exchanged. (Santana Dep. at 28, 29.) Berger followed up this phone message by visiting Santana's office on December 22, 1993, at which time he told Santana that he did not sign a management agreement with Mom's, and that he could not get back into the Colley Avenue location to retrieve Donaline's license. (Santana Aff. ¶ 18.) Nevertheless, Berger asked Santana not to take any action and instead, to give him and the Mom's owners more time to resolve the issue.[21] (Santana Dep. at

---

or having any ownership interest amounting to 10% or more of the entity;

(e) provide ABC all information necessary to determine if any other entities or persons have any ownership, management, or other financial interest in the entity;

(f) provide ABC copies of all management agreements, articles of incorporation, charters, partnership agreements, or other evidence of ownership or management;

(g) demonstrate financial responsibility sufficient to meet the requirements of the business, including the timely payment of all tax obligations to local, state or federal governments;

(h) keep and maintain complete and accurate books and records of the business on the premises, that reflect all purchases and sales of food and alcoholic beverages;

(i) keep ABC informed of all changes of ownership or management of a licensee;

(j) sell food in the amount of at least $4,000 per month for establishments having a mixed beverage license and a ratio of food to mixed beverage of 45% to 55%;

(k) purchase alcoholic beverages for the licensee establishment from an authorized ABC source, and only sell those alcoholic beverages in the licensee's establishment and in a manner permitted by the Code of Virginia and ABC regulations;

(*l*) purchase alcoholic beverages for the licensee's establishment using cash or a check drawn on the account of the licensee.
(Santana Aff. ¶ 10.)

18. The ABC seems to have exercised some faulty and divergent reasoning. On the one hand, as will be seen the ABC was seeking to punish Mom's for selling alcohol without a license at the Colley Avenue location because

Mom's did not have a valid management agreement; on the other hand, the ABC was trying to hold Mom's responsible for nonpayment of taxes on the Colley Avenue location that had occurred for more than one year prior to Mom's occupation of the location—this could only be done if Mom's owned the location or had a valid management agreement requiring them to pay the sales taxes and other taxes which no agreement required.

19. As noted above, Donaline also had not paid sales tax on the location since October 1992. Nevertheless, the ABC did not issue any citations or warnings for the location until the Mom's principals took over the location and were negotiating with Donaline.

20. Since the Norfolk Jewish Mother was to be operating under Donaline's ABC license pursuant to a management agreement while Mom's obtained a new license, Berger would have had the absolute right to enter the Colley Avenue location, reclaim Donaline's license and surrender it to the ABC. (E.H. Tr., Vol. III at 740.) Berger did finally reclaim Donaline's license for the Colley Avenue location, but not until July 1994, well after the searches. (*Id.* at 732.)

In April 1994, Mom's finally reached a deal with Donaline in which Mom's agreed to acquire Donaline's stock and pay whatever taxes and debts were owed by Donaline on the location up to a certain limit. (*Id.* at 733.)

21. Presumably because Berger was negotiating with the Mom's principals, he did not want the ABC to prevent the operation from continuing.

36.) In accordance with the request from Berger, Santana did not pull the ABC license of Donaline. Notably, neither Berger nor Santana ever called Callahan to ask him to surrender Donaline's license for the Colley Avenue location. (E.H. Tr., Vol. III at 734.) Throughout this period, the principals of Mom's genuinely believed that they were operating under a valid management agreement prepared by Callahan, despite the fact that shortly after December 25, 1993, Shofner still had not returned the signed management agreement to Callahan as he had requested. (E.H. Tr., Vol. III at 726.) When Shofner finally returned the agreement to Callahan, it bore what appeared to be Berger's signature.[22] (*Id.* at 728.) Around this same time, Shofner told Bonk and Callahan that she was going to file an ABC license application on behalf of Mom's for the Colley Avenue location. (*Id.* at 752.)

Around January 4, 1994, Bonk informed Santana that The Jewish Mother was setting up a corporation to purchase Donaline's stock, and instructed Santana to deal directly with Deborah Shofner. (Santana Dep. at 37; E.H. Tr., Vol. IV at 779.) Around January 13, 1994, Santana received a faxed copy of the management agreement from Shofner purportedly signed by Bonk and Berger.[23] (Santana Aff. ¶ 21; E.H. Tr., Vol. IV at 780.) Santana did not, however, receive any other documents regarding the purchase of Donaline by Mom's or any other entity associated with Mom's. (Santana Aff. ¶¶ 22–26.) Around January 19, 1994, Shofner told Santana that Mom's was going to acquire Donaline's stock on January 27, 1994. (Santana Aff. ¶ 24.) Shofner also sent Santana a copy of a card showing her to be the "comptroller" of The Jewish Mother. (Santana Aff. ¶ 24.) By this time, Shofner had convinced Bonk and Colaprete that

Gray was overcharging for his services, and thereby, she had displaced Gray and become Mom's main bookkeeper. (Bonk Dep. at 38; E.H. Tr., Vol. III at 503.) Meanwhile, Santana was still waiting for the ownership documents he had requested from Mom's.

Although Santana was waiting for documents from Mom's concerning its acquisition of the Colley Avenue location, he never contacted Callahan to see what the problem was. (E.H. Tr., Vol. III at 728.) As noted above, Santana had interacted with Callahan with regard to other ABC matters for several years prior to this transaction. (*Id.* at 728.) In December 1993, Callahan informed Santana that Mom's was looking to acquire the Colley Avenue location. (Santana Dep. at 8; E.H. Tr., Vol. IV at 762.) Callahan also had informed Santana that an ABC application for the Colley Avenue location would be forthcoming. (E.H. Tr., Vol. III at 727–28.) Callahan claims that Santana and the ABC knew from the beginning that he was representing Mom's with regard to the Colley Avenue location in its dealings with the ABC. At the evidentiary hearing, Callahan testified as follows:

THE COURT: Did the ABC people know you were handling this thing, Mr. Callahan?

THE WITNESS: Yes, sir, right from the start. I mean I had been dealing with Mr. Santana the whole time. Mr. Santa [sic] had this district. I mean he basically did the west side of Norfolk, had done a couple of places downtown. And anytime in the past we had something, if he called, we got it for him. I mean there was no inclination that there was anything so wrong that it could not be corrected by correcting some paperwork.

---

22. In actuality, according to Berger's statement to Santana he had not signed the agreement, and his signature had been forged by Shofner. Callahan, Bonk, and Colaprete would not learn this fact until April 1994. Shofner claimed that Bonk told her to sign Berger's name. It now appears that this was possibly one of the first in what would become a long line of "misstatements" by Shofner.

23. As noted above, Shofner had in fact forged Berger's signature.

(E.H. Tr., Vol. III at 742.) Callahan believed that Mom's had a good ABC track record at the Virginia Beach Jewish Mother and therefore, he did not expect any problems in securing a new license for the Colley Avenue location. (*Id.* at 727–28.) Santana admits that Callahan told him in December 1993 that Mom's was going to acquire the Colley Avenue location, nevertheless, Santana claims he did not know Callahan was representing Mom's in the transaction until after March 25, 1994. (E.H. Tr., Vol. IV at 804.)

By January 1994, Mom's was operating Jewish Mother restaurants in Virginia Beach and at the Colley Avenue location in Norfolk. Without question, at this point Mom's was unknowingly violating state law. Bonk and Colaprete at that time believed they had a valid management agreement with Donaline to operate the Colley Avenue location. According to Berger, Shofner had in fact forged Berger's signature to the management agreement. That Berger's signature on the document was made by Shofner was not known to either Bonk or Colaprete, who believed the signature to be genuine. Oddly, the ABC knew it was not Berger's signature, but never conveyed this to Callahan or the owners of Mom's. The ABC did not pull the license at Berger's request, and a question arises as to whether those actions constituted a ratification of the false signature by Berger. Mom's was violating Virginia law because they had no valid management agreement, unless Berger's actions would have been considered a ratification, and therefore no ABC license to sell alcohol at the Colley Avenue location.[24] Moreover, Mom's had not paid any sales tax on the Colley Avenue location since reopening in December. According to Bonk, Shofner told him that because Mom's was only operating the Colley Avenue location a portion of December, they would not have to pay any sales tax until February 20, 1994. (Bonk Dep. at 127.) The fact that Mom's was operating without a license and had not paid any sales tax would have been enough to merit an investigation and warning by the ABC. In fact, Santana and the ABC could even have entered the Colley Avenue location and seized The Jewish Mother's financial records as well as the license of Donaline without a warrant pursuant to the ABC's regulatory power. However, the ABC choose not to exercise this power. Arguably, the ABC was on hold in accordance with Berger's request. A jury could conclude as Callahan did that Berger and Lineberry were trying to better their deal while the ABC took no action, all of which might arguably be considered ratification.

On January 26, 1994, Shofner visited the office of Joseph Werle ("Werle"), a detective in the Economic Crimes Unit of the Virginia Beach Police Department. (Werle Dep. at 6–7.) Shofner told Werle that she was the comptroller of The Jewish Mother, and that a Jewish Mother employee named Veronica Haight had been embezzling funds from the restaurant. (*Id.* at 7.) Shofner brought a box of cash register tapes and nightly receipts, which she and Werle went over. (*Id.* at 7, 8.) Werle told Shofner that before opening an investigation he needed more information to corroborate her story. (*Id.* at 8, 9.) Shofner left Werle's office, but never provided any further information.[25] (*Id.*)

By mid-March 1994, several things were occurring with regard to The Jewish Mother and its principals. First, the principals were legally operating a restaurant in Virginia Beach. Second, the principals

---

**24.** Under Virginia law, Mom's could not sell alcohol at the Colley Avenue location unless it was operating under a valid management agreement with Donaline or under an ABC license issued to Mom's for that location. As it turns out, Mom's had neither, unless Berger ratified the agreement. Furthermore, under Virginia law all persons purchasing alcohol from the restaurant were also violating the law. (E.H. Tr., Vol. III at 741.)

**25.** As it later turned out, Veronica Haight was not embezzling money from The Jewish Mother, instead Shofner was allegedly taking Mom's money and placing it in an account with Merrill Lynch. (Bonk Dep. at 128.)

were allegedly illegally operating at the Colley Avenue location, although they mistakenly believed they had a valid management agreement to operate the location.[26] Third, the principals were continuing to negotiate with Donaline over the sale of the Colley Avenue location. Meanwhile, Mom's principals were beginning to suspect that Shofner was embezzling from the company. Also at this time, Santana was still waiting to receive the sales documents he had requested from Mom's. (Santana Aff.¶ 26.)

On March 22, 1994, Santana contacted Bonk and informed him that he would be filing a violation report against Mom's and Donaline if he did not receive sales documents within seven days. (Santana Aff. ¶ 26.) On that same day, Santana visited the Colley Avenue location and issued a written warning to Donaline for failing to disclose all ownership interests in Donaline to the ABC. (Santana Aff. ¶ 27.) The warning stated that the ABC needed information concerning either the purchase of Donaline, a transfer of stock assets, or a new lease. (E.H. Tr., Vol. IV at 769–71.) The issuance of this warning is curious, because since Santana was in touch with Berger, the ostensible seller of the Colley Avenue location with Lineberry, Santana certainly could have learned what documents existed concerning the sale of the location from Berger himself. He also could have contacted Callahan regarding the same, but he did not.

About this same time, Colaprete, Bonk, and Jewish Mother manager and plaintiff Richard Scott Miller confirmed their suspicion that Shofner had been embezzling from The Jewish Mother. On March 19, 1994, Mom's fired Shofner, (*Id.* at 782–83), and soon thereafter Miller contacted Detective Werle and told him about the embezzlement. (Werle Dep. at 9–10.) Werle told Miller he needed to come to the police

station to file a report. Colaprete also called Werle with the same information. (Werle Dep. at 10–11.) Miller and Colaprete did not immediately go to the police station, however. By this time, Miller knew that Shofner was on parole for a conviction for credit card fraud. (Bonk Dep. at 99.) Accordingly, on March 24, 1994, Miller and Colaprete visited Shofner's probation officer, Mary Farashahi ("Farashahi")[27] and informed her of their allegations against Shofner. (E.H. Tr., Vol. II at 101–02.) Farashahi advised Colaprete and Miller to speak with an attorney. (*Id.*) Shortly after, they did in fact contact Norfolk Commonwealth's Attorney Chuck Griffith ("Griffith"). (*Id.* at 105.) Griffith contacted Farashahi on March 27 to discuss Shofner. (E.H. Ct. Ex. 1, Notes of Probation Officer Farashahi).

While Miller and Colaprete were accusing Shofner of embezzlement, she was accusing Bonk, Colaprete, and Miller of wrongdoing as well. On March 25, 1994, Shofner called Santana and told him she had been lying about Mom's impending deal with Donaline. (Santana Aff. ¶ 31.) Santana did not know that Shofner had already been fired by Mom's at this point. (E.H. Tr., Vol. IV at 782–83.) Shofner conveyed the following information to Santana:

1) contrary to what Bonk had told Santana on December 15, Mom's held the lease on the Colley Avenue location;

2) no state sales tax had been paid by Mom's for the Colley Avenue location since December;

3) Mom's was not keeping records of conducting business at the Colley Avenue location;

4) Mom's was currently using Donaline's ABC license, but intended to apply for a new license; and

---

**26.** As noted above, by March, Berger by requesting the ABC not to take action months earlier may have ratified the forged signature.

**27.** During the course of this litigation, Ms. Farashahi was married and her name was

changed from Rafferty to Farashahi. Thus, some court documents refer to her as Rafferty. For convenience and consistency, she will be referred to as Farashahi throughout this order.

5) there was a state tax lien of $54,000 against Donaline, and Mom's was going to "get rid" of the Donaline corporation and walk away from the tax liability and apply for a new license. (Santana Aff. ¶ 31.)

Meanwhile, D.B. Gray, who had been rehired sometime between March 22 and March 28, 1994 to replace Shofner as Mom's accountant, informed the ABC and IRS of the situation concerning Shofner's alleged embezzlement. On March 28, 1999, Gray telephoned ABC defendant Altman, who was at the time Special Agent in charge of the Financial Investigation Section of the ABC, (E.H. Tr., Vol. II at 432), and informed him that he had recently been retained to complete the Virginia Beach Jewish Mother's 1993–1994 MBAR. Gray also advised Altman that Mom's had received a written warning from the ABC because its MBAR was late. Gray stated that he needed an extension because the previous bookkeeper, who the owners suspected had been embezzling from the company, had not filed the report as required. Gray followed up the telephone conversation on the same day by faxing a letter to Valarie Kelley ("Kelley") at the ABC. Kelley was an investigator accountant with the ABC who, among other things, was responsible for spot-checking MBARs for suspicious figures. (E.H. Tr., Vol. II at 362, 364.) Gray's letter to Kelley provided that on March 22, 1994 Mom's had discovered "gross embezzlement and destruction of records by their bookkeeper." (E.H. Tr., Vol. III at 508; E.H. Ex. Vol. II, tab KW1.) The letter also stated that Mom's had recently discovered that many of Mom's tax and other filing requirements had not been met, including the 1993 MBAR. (E.H. Ex. Vol. II, tab KW1.) In the letter, Gray requested an extension of time to complete the MBAR, and assured Kelley that he was working to complete all necessary documentation. (Id.) He advised Kelley that charges of embezzlement against the former bookkeeper had been referred to the Virginia Beach Police Department. (Id.) Altman saw a copy of this letter and forwarded it to the IRS. (E.H.

Tr., Vol. II at 433–34.) Although the letter did not name Shofner specifically as the person allegedly embezzling, Altman believed the letter was referring to Shofner, and that any reasonable person who saw the letter would have believed the same. (Id.) In addition to sending this letter to the ABC, Gray also wrote the IRS and advised that Mom's might be late in filing its first quarter tax return. (E.H. Tr., Vol. III at 509–10.)

When Mom's principals discovered that Shofner had been embezzling, they also learned that she had not submitted an application for an ABC license on behalf of Mom's as she had indicated she would. (Bonk Dep. at 62–63.) Bonk thought Shofner had submitted an application for a license immediately after the restaurant reopened at the Colley Avenue location on December 15, 1993. (Bonk Dep. at 51.) Callahan also believed the license application process was underway and that the Colley Avenue location would have a new license within thirty to forty-five days after reopening. (E.H. Tr., Vol. III at 729.) After learning Shofner had in fact not filed for a license, Bonk went to Callahan's office to fill out the necessary paperwork to obtain a license. (Bonk Dep. at 63–64.) On March 28, 1999, Mom's finally filed an application for an ABC license for the Colley Avenue location. (Bonk Dep. at 49.) Still, at this point neither Santana nor anyone else at the ABC had contacted Callahan with any concerns, despite the fact that Berger had told Santana the management agreement had been forged, and despite Shofner's allegations.

Instead of calling Callahan, Santana relayed Shofner's allegations to his supervisor, ABC defendant Robert Dunford. Dunford was the Assistant Special Agent in charge of the Financial Investigations Section for the ABC and was operating out of Richmond, Virginia at the time. (E.H. Tr., Vol. I at 21.) Although he was a former Norfolk police officer, Dunford maintains he did not know that Lineberry, through his company Southern Amuse-

ments, had mortgages on most of the taverns in Tidewater. By this time, Dunford already knew that Mom's was possibly selling alcohol at the Colley Avenue location without a license, since Santana had informed him about the situation in January 1994. (*Id.* at 46–47, 92–93.) Based on this information alone, Dunford wanted to arrest the owners of The Jewish Mother, (*Id.* at 78, 118; Dunford Dep. at 92–93.), however, according to Dunford, the higher-ups at the ABC felt that no arrest should be made. Before Santana approached him with this information, however, Dunford claims he had already been conducting his own investigation into the finances of the Virginia Beach Jewish Mother. Dunford claims that in October 1993, he examined the Virginia Beach restaurant's MBARs for reporting years 1989 through 1992 and determined that the owners had under-reported more than $500,000 in sales in one year.[28] (*Id.* at 9, 48; Dunford Dep. at 8.) After conducting this analysis, Dunford claims he then sent the MBARs to the IRS pursuant to the ABC/IRS information sharing agreement. As noted earlier, a jury could easily find that The Jewish Mother MBARs sent to the IRS in October 1993 were those specifically requested by IRS agent Ryan and consisted only of those MBARs representing the reporting years 1991 and 1992, not 1989 through 1992 as Dunford reports.[29] Those MBARs were sent to the IRS because the IRS requested them—not for the reasons claimed by Dunford. A jury could find

that the comparison and analysis Dunford claims to have conducted in October 1993 was not performed until after March 25, 1994.

Regardless of when Dunford actually conducted his analysis, Dunford states that in his analysis he used certain pricing information for the Virginia Beach Jewish Mother he obtained from Norfolk Police Sergeant Stephan Bennis ("Bennis"), who had visited the Virginia Beach Jewish Mother on a social basis. As will be explained below, Bennis did not become involved in this investigation until March 1994 after Shofner approached Santana. Dunford did not consult the ABC agent assigned to the Virginia Beach location to determine prices. (E.H. Tr., Vol. I at 34.) Bennis told Dunford that the cheapest beer one could purchase at the Virginia Beach location was two dollars. (*Id.* at 31, 33.) Based only on the beer pricing information he received from Bennis and without any information concerning the price of wine, Dunford claims he compared The Jewish Mother MBAR "beer and wine" purchase and sale figures against the average state-wide markup for purchases and sales and concluded that The Jewish Mother was under-reporting its sales and possibly in violation of federal law.[30] (*Id.* at 103, 126.) The Virginia Beach Jewish Mother reported on its MBAR covering the period February 1989 through January 1990 that it spent $93,626.26 to purchase beer and wine that was sold for $133,-176.80. The MBAR for February 1990

---

**28.** Contrary to his assertions in his deposition, in his testimony at the evidentiary hearing Dunford testified that based on the MBARs he felt the Virginia Beach Jewish Mother was only skimming $500,000 every *two* years instead of every year. (E.H. Tr., Vol. I at 123.)

**29.** As stated earlier in these facts, prior to October 12, 1993 the ABC had sent two batches of MBARs from potentially under-reporting restaurants in the Tidewater, Virginia area to the IRS, eight restaurants in July 1993 and another eight restaurants in September 1993. Neither batch contained MBARs from The Jewish Mother. After IRS agent Ryan's request on October 12, 1993,

ABC defendant Altman sent the 1991 and 1992 MBARs from The Jewish Mother to Ryan.

**30.** According to Dunford, the state-wide average markup for beer/wine at the time he reviewed The Jewish Mother's MBARs was 2.6 or 2.8 to 1. (E.H. Tr., Vol. I at 102.) ABC agent Valerie Kelley testified that the beer/wine markup was 2.7 to 1. (E.H. Tr., Vol. II at 384.) However, Dunford claims he expected the average markup in the Virginia Beach area to be 5 to 1. (E.H. Tr., Vol. I at 108.) A jury could conclude that this latter statement completely failed to take into consideration any wine sales, and for that matter, was clearly an exaggeration of the markup figures.

through January 1991 reported beer and wine purchases of $75,671.17 and beer and wine sales of $92,086.32. The MBAR for the period February 1991 through January 1992 reported beer and wine purchases of $131,590.02 and beer and wine sales of $72,949.69. The MBAR for February 1992 through January 1993 reported beer and wine purchases of $126,327.44 and beer and wine sales of $201,231.42. Dunford felt the beer and wine sales figures on the MBARs for 1989–1990, 1990–1991, and 1991–1992 were all understated. Dunford examined only the wine and beer figures on the MBARs—not the mixed beverage figures. (*Id.* at 51.) He did not consider that the beer and wine figures might have been inadvertently reported with mixed beverages. Clearly the mixed beverage figures were greater than that which would have been the general markup.[31]

After hearing the information Santana obtained from Shofner in March, Dunford instructed Santana to question Shofner about the Colley Avenue location, despite the fact he knew that she had been accused of embezzlement. (E.H. Tr., Vol. I at 21–22; Santana Aff. ¶ 37.) Accordingly, on March 29, 1994, Santana and Detective M. Melville ("Melville") of the Norfolk Police Department went to Shofner's house to interview her.[32] (Santana Aff. ¶ 37.) After speaking with Santana and Melville at her home, Shofner agreed to come to the Norfolk Police Department for further questioning. (Santana Aff. ¶ 37.) That same day, Santana, Melville, and Bennis interviewed Shofner at the Norfolk Police Department. (Santana Aff. ¶ 38.) Accord-

ing to Santana and Bennis, at this meeting Shofner provided the following information:

1) Berger was no longer involved with the Colley Avenue location;
2) the lease on the Colley Avenue location was in the name of Mom's;
3) once the ABC became interested in the ownership and operation of the Colley Avenue location, she had been told by Bonk to lie to Santana and the ABC and withhold information from him and the ABC concerning the business at the Colley Avenue location;
4) Mom's had asked her to make two sets of books, one for tax purposes and another correct set of books for the business;
5) Berger had not signed off on the management agreement between Mom's and Donaline and that she had forged his signature;
6) Mom's had not paid any state meal taxes on the Colley Avenue location;
7) Bonk and Colaprete had discovered some tax problems with Donaline and were going to abandon the Donaline corporation and apply for a new license under Mom's name;
8) she had seen what she believed to be in excess of 100 kilograms of cocaine on the premises of the Virginia Beach Jewish Mother stacked in one foot by one foot bags in a pile equivalent to the size of a cord of wood;
9) Richard Miller, one of the individuals involved with Mom's had been convicted of drugs;

---

**31.** The Jewish Mother's MBAR for February 1990 through January 1991 reported $39,776.96 in mixed beverage purchases and $217,395.37 in mixed beverage sales. The February 1991 through January 1992 MBAR reported $52,489.73 in mixed beverage purchases and $223,621.86 in mixed beverage sales. The February 1992 through January 1993 MBAR reported $50,642.80 in mixed beverage purchases and $274,835.74 in mixed beverage sales, all of which were greater than average markups.

**32.** At the same time he was performing his ABC duties in late 1993 and early 1994, San-

tana was assisting the Criminal Intelligence Unit of the Norfolk Police Department with a grand jury investigation in the Tidewater area. (E.H. Tr., Vol. IV at 761.) According to Santana, since this investigation involved a Norfolk restaurant, he felt it was appropriate to involve the Norfolk Police Department in the interview. (Santana Aff. ¶ 37.) However, neither he nor Melville, Bennis, or any other Norfolk police officer ever contacted the Commonwealth's Attorney of Norfolk, who, as noted above, had been notified by Mom's principals that Shofner was embezzling and had already begun investigating the situation and had called Shofner's probation officer.

10) the Mom's owners had been under-reporting more than one million dollars every year since 1989, up to two million dollars in one particular year, for the Virginia Beach Jewish Mother;

11) she had been Mom's bookkeeper since October/November 1993;

12) she was a CPA and had graduated from college;

13) she had a criminal record and was on probation;

14) all the money from the Colley Avenue location was going to Mom's;

15) the persons operating the Virginia Beach Jewish Mother were skimming money from that operation;

16) money was being laundered through The Jewish Mother out of the Caribbean via wire transfers;

17) Colaprete had Jamaican connections;

18) someone from The Jewish Mother had beaten her up and threatened to hurt her and her baby if she spoke with Santana.

(Santana Aff. ¶ 38; Santana Dep. Ex. 3; Bennis Dep. at 9.) According to Bennis, he believed Shofner's story because she appeared to be incriminating herself,[33] she was in a position to know the facts she claimed to know, and she was willing to testify. (E.H. Tr., Vol. II at 297.) Bennis scheduled a second interview for Shofner to be held the next day at the FBI offices in Norfolk, and called Dunford's supervisor, ABC defendant Altman, in Richmond, to inform him of the situation. (Id. at 444–45.) Bennis made it quite clear that the state sales tax was not part of this investigation regardless of what others may say. (E.H. Tr., Vol. II at 270.) Dunford disagrees with Bennis saying the main concern at ABC is sales tax. (Dunford Dep. at 48.)[34] A jury could believe Bennis.

While Santana, Bennis, and Melville were meeting with Shofner on March 29, 1994 in Norfolk, Miller and Colaprete were finally meeting with Detective Werle in Virginia Beach to discuss their allegations against Shofner. (Werle Dep. at 12.) The day before the meeting with Miller and Colaprete, Werle ran a computerized criminal history search on Shofner through the National Computerized Information Center ("NCIC"). (Id. at 12–14.) From the NCIC, Werle learned that Shofner had previously been sentenced to ten months imprisonment for credit card fraud in Florida. (Id. at 13.)[35] In addition, on March 28, 1994, Werle called and spoke with probation officer Farashahi. (See E.H. Ct. Ex. 1, Notes of Probation Officer Farashahi.) After the meeting with Colaprete and Miller on March 29, Werle entered Shofner's name into the Virginia Beach Economic Crimes Unit database, which is a record of all persons under investigation in Virginia Beach for economic crimes.[36] (Id. at 20, 25–27; E.H. Tr.,

33. As will be discussed below, any belief on Bennis's part that Shofner's participation in a "book cooking scheme" would send her back to prison was ill-placed. Since, as Shofner told Santana, Melville, and Bennis, she came to work for Mom's in October 1993, it would have been impossible for her to have "cooked the books" for the tax returns for the years prior to and including 1992, which had already been filed. Furthermore, the 1993 tax return was not due at the time Shofner made the allegations. It is difficult to conceive that Shofner could be tried for fraud that was committed before her employment with Mom's or fraud that had not yet been committed. A jury could easily find that any reliance placed by Defendants in concluding that Shofner's story was true on the belief that Shofner was incriminating herself was a rationalization coming about only after a realization that they had all been duped by Shofner.

34. A jury could easily find Dunford's statement incredible since Donaline, Berger and Lineberry's company, had paid no sales tax from October 1992 through November 1993 without any reprimand.

35. One month after the searches, in May 1994, Werle also called Agent Richard Coughlin of the United States Secret Service in Jacksonville, Florida about Shofner. Coughlin told Werle that Shofner was an excellent liar and that she even lied to the federal judge when she had been sentenced for a federal crime. (Werle Dep. at 77.)

36. Although the database is located in the economic crimes unit, the information con-

Vol. II at 70–72.) Thus, before the affidavit and the search warrants were issued in this case, both Werle of the Virginia Beach Police, and Griffith, the Commonwealth's Attorney of Norfolk, were investigating Shofner. (E.H. Ct. Ex. 1, Notes of Probation Officer Farashahi.)

The next day, March 30, 1994, Shofner was brought to the FBI offices in Norfolk. There is a dispute as to how many meetings were conducted at the FBI office and who was present at each meeting. Plaintiffs maintain that there were two meetings at the FBI office. Defendants argue that there was only one meeting. Plaintiffs rely upon the testimony of former FBI agent Steven Scheiner ("Scheiner").[37] Scheiner claims he participated in a meeting with Santana, Bennis, and Shofner, at which the topic of a joint investigation of The Jewish Mother conducted by the ABC, Norfolk Police, and the FBI was raised. (E.H. Tr., Vol. IV at 836.) According to Scheiner, at this meeting Shofner stated that she was friends with Sonny Stallings ("Stallings"), a prominent attorney in the Tidewater area, and that Stallings had been approached and threatened by someone affiliated with The Jewish Mother in an effort to persuade Stallings to prevent Shofner from turning over any of The Jewish Mother's records to the ABC. (Scheiner Dep. at 8.) Scheiner claims that after hearing Shofner's story, he advised Santana and Bennis that the FBI was not interested in the matter and that he doubted the veracity of Shofner's story, especially her drug allegations, and felt her accusations needed corroborating.

(*Id.* at 12.) Scheiner maintains that he indicated to Santana and Bennis that he felt that it did not make sense for The Jewish Mother principals to approach and threaten Stallings, and that Shofner's story sounded like something from a bad movie. (*Id.* at 17.) Scheiner knew Stallings through a mutual friend. (Scheiner Dep. at 13.) Accordingly, Scheiner claims he suggested to Bennis and Santana that they allow him to ask Stallings whether he knew Shofner and if Stallings had in fact been approached by someone trying to keep Shofner from going to the ABC. (*Id.* at 11.) Santana and Bennis declined Scheiner's offer to use Stallings to corroborate that portion of Shofner's story, (*Id.* at 13), and indeed never contacted Stallings.[38]

Contrary to Scheiner's account, the other witnesses describe only one interview conducted at the FBI office, in which FBI agent Beth O'Brian ("O'Brian"), Santana, Dunford, Bennis, Altman, and several other unidentified individuals were present and listened to Shofner's story of alleged drugs, embezzling, and fraud at The Jewish Mother. (Altman Aff. ¶ 18; Bennis Aff. ¶ 10; Dunford Aff. ¶ 19.) At this meeting Shofner had with her a box containing what she claimed were business documents from The Jewish Mother, including cash register tapes and handwritten daily sheets. (Bennis Dep. at 14.) Although no one has been able to remember or produce the documents Shofner had with her at the meeting, in a memorandum memorializing the meeting O'Brian stated that Shofner presented "persuasive documentation" showing that The Jewish Mother maintained two sets of books.[39]

tained therein is available to all Virginia Beach police. (Werle Dep. at 27; E.H. Tr., Vol. II at 70–72.)

**37.** The ABC defendants indicate in their brief that Scheiner's credibility is in doubt in this case because he went to work for a law firm representing John Colaprete. In his deposition, Scheiner indicated that he is an investigator with the law firm of Rabinowitz, Rafal, Swartz, Taliaferro & Gilbert. There is no record of this firm having represented Colaprete in any form in this matter. That firm may have represented Colaprete with regard

to another matter, but the ABC defendants have not shown any conflict with regard to this case.

**38.** Shofner was also alleged to have misappropriated funds from Stallings.

**39.** Although O'Brian felt Shofner had presented "persuasive documentation," at the evidentiary hearing she could not recall exactly what that "persuasive documentation" consisted of, nor has this Court seen any persuasive documentation supporting the conclusion that there was under-reporting. The Court has spent hours searching for anything that

(E.H. Tr., Vol. II at 48–49; E.H. Ex. Vol. II, tab 9, p. 9.) However, O'Brian was skeptical of Shofner's claim that she had seen more than 100 kilograms of cocaine at the Virginia Beach Jewish Mother. She relayed Shofner's drug story to a drug agent who also expressed skepticism about its veracity. (E.H. Tr., Vol. II at 53–54.) O'Brian then informed her supervisor that she felt the case was better suited for the IRS rather than the FBI. (*Id.* at 52–53.) Notably, O'Brian left this meeting under the impression that it was the ABC that wanted to seek search warrants in the case, noting in her memorandum that "[t]he ABC Board intends to move quickly to prepare search warrant affidavits for both JM restaurants and the homes of the three owners." [40] (*Id.* at 62; E.H. Ex. Vol. II, tab 9, p. 10.) This note is interesting, since it tends to show that it was the ABC which intended to seek search warrants for the residences of the principals of The Jewish Mother.

At this meeting, Shofner also told the agents that The Jewish Mother's owners kept a second copy of The Jewish Mother's financial records detailing their skimming on the second floor of The Jewish Mother location at Virginia Beach. For Dunford, who already wanted to arrest The Jewish Mother principals, the location of the records was the only piece of information provided by Shofner that was both new to him and useful.[41] (E.H. Tr., Vol. I at 75.) Armed with knowledge of the location of the alleged second set of books, pursuant to Virginia law Dunford and the ABC could have legally entered the Virginia Beach Jewish Mother restaurant without a search warrant and seized all business records.[42] (*Id.* at 41.) Dunford did not need the assistance of the FBI, IRS, DEA, or any other agency to take such action. But Dunford did not pursue this available course of action, and instead, decided to take Shofner's story to the IRS to seek search warrants, which were totally unnecessary to obtain the records.

By late in the evening on March 30, 1994, Shofner remained at the FBI office while Dunford described the situation and Shofner's allegations to IRS defendant Cheryl Kast. (Willman Dep. at 25–26.) Kast was the group supervisor of IRS special agents in the Criminal Investigation Division of the IRS' Norfolk office. (E.H. Tr., Vol. III at 567.) After speaking with Dunford, Kast assigned IRS defendant Carol Willman to handle the case. (Willman Dep. at 26.) Willman had been with the IRS since 1986, and came to the Tidewater area in 1990. (E.H. Tr., Vol. III at 648–49.) Prior to this case, she had assisted other agents in a limited capacity on only one other investigation concerning a restaurant. (*Id.* at 679–80.) After being assigned to the case by Kast, Willman went to the FBI office and listened to Shofner once again recount her story, this time in the presence of O'Brian, Dunford, Altman, Bennis, and Santana.[43] (Willman Dep. at 26.) In addition to the information she had already provided, Shofner told Willman the following:

1) Mom's rented a storage space, unit number 118, for sixty-six dollars per month;

---

looked or resembled in any way "persuasive documentation" and has yet to find anything that was independent of Deborah Shofner except the MBARs which were not totally correct.

40. Although they did not need a search warrant, the ABC agents could have obtained a state search warrant on their own without the aid of the IRS, but that would have taken longer. (Willman Dep. at 183.)

41. According to Dunford, the location of financial records is the single most difficult piece of information to ascertain in a financial investigation. (Dunford Dep. at 81.)

42. The ABC has an absolute right to enter a licensed establishment without a search warrant to seize business records. (E.H. Tr., Vol. I at 41.)

43. Santana, Altman and Dunford maintain that they never participated in any meeting with Shofner and Willman. (Altman Aff. ¶ 18; Dunford Aff. ¶ 22; Santana Aff. ¶ 38.)

2) she had participated and established the accounting mechanism to hide Mom's scheme to defraud the ABC, state department of taxation, and the IRS; and

3) she had discovered that Mom's had under-reported $2 million in 1993, $1.9 million in 1992, $1 million in 1991, $1 million in 1990, and $1 million in 1989.

(Search Warrant Aff. ¶¶ 8, 10, 11.) The meeting lasted approximately one hour. Although Shofner still had her box of documents with her, none of the documents were reviewed at that time. (Willman Dep. at 26, 28.) Altman assigned Dunford and Kelley to work closely with Willman and to provide her with any assistance she needed in her investigation. (E.H. Tr., Vol. II at 454.)

At this point, the IRS had officially become involved in the investigation. There is a question as to whether this was the IRS' investigation or a joint investigation between the IRS and ABC. ABC defendants Altman and Dunford contend that the IRS ran the investigation and that the ABC was only involved in a support role.[44] IRS defendants Willman and Kast contend that this was a joint investigation.[45] A jury could easily find that, at the very least, this was a joint investigation, and quite possibly an ABC investigation in which the ABC agents merely used the resources and power of the IRS for their own purposes.[46]

The following morning, March 31, 1994, the group traveled to the ABC offices in Richmond, where Willman met with Shofner, Altman, Dunford, Bennis, Santana, and Kelley. (Willman Dep. at 29–30.) Dunford drove Shofner from Norfolk to Richmond. (E.H. Tr., Vol. I at 121.) Dunford claims that Deborah Shofner and he did not discuss any of these matters at all during the hour and a half to two hour drive to Richmond. (E.H. Tr., Vol. I at 71.) A jury might find this difficult to accept since Mrs. Shofner was so loquacious. Although Willman does not specify how long this meeting lasted, she remained at the ABC office in Richmond from nine in the morning until two the next morning. (Willman Dep. at 30.) While in Richmond at the ABC's offices, Willman began drafting an affidavit in support of a search warrant. During this time, Willman reviewed a so-called analysis of the documents Shofner had provided that was being prepared by ABC accountant Valarie Kelley. (Willman Decl. ¶ 2.) Willman also spoke with Bennis about steps he was taking to corroborate information, and she conducted a limited investigation of her own. Although investigations conducted prior to the application for search warrants are often necessarily conducted in a short period of time due to the exigencies of the situation, this investigation was even more hurried than usual. Sunday April 3, 1994 was Easter Sunday, and beginning

---

**44.** According to Altman, the IRS treated the ABC as suppliers of information, claiming that "[the ABC] took the informant to IRS, IRS decided that they wanted to open the case, and [the ABC] yielded to them." (E.H. Tr., Vol. II at 463–64.)

**45.** According to Willman:

[i]t was a joint investigation. We believed that there were crimes that had been committed against the Internal Revenue Service. That's why we got the warrant. But there were also crimes that had been committed against ABC. It was a joint investigation.

\*     \*     \*     \*     \*     \*

... I mean we discussed the possibility of [the ABC] getting [the search warrant], and they said it would take us longer and we're

not sure that, we're not sure we want to go to Virginia Beach because of the location of The Jewish Mother, so I mean it was agreed upon by everybody that IRS would do it. (Willman Dep. at 194.)

**46.** Indeed, ABC defendant Dunford stated in his deposition that in his opinion, the IRS was "a tool to bring licensees in compliance when [the ABC] do[es] not have the manpower or the resources or the training for the agents in order to conduct one of these financial investigations." (Dunford Dep. at 24.) Ironically, Dunford stated in his deposition that he was proud to associate with the IRS on investigations, because "[t]hey are very patient, very meticulous ..." (*Id.* at 25.) Contrary to Dunford's statement, the record does not appear to reflect anything resembling a patient or meticulous investigation in this case.

the Monday after Easter, April 4, 1994, all of the IRS agents involved in the case were due to attend a professional education training seminar at the FBI Academy in Quantico, Virginia. (E.H. Tr., Vol. III at 594; Willman Dep. at 131.)

## B. ABC Agent Kelley's Analysis

Kelley began working for the ABC in Richmond as an investigator accountant on August 30, 1993. (E.H. Tr., Vol. II at 427.) At that time she was a recent graduate and had obtained a degree in business administration and had passed two sections of the CPA exam. (*Id.* at 363.) In early 1994, Kelley's supervisor was ABC defendant Altman. She also worked with Dunford on occasion. Her responsibilities included spot-checking MBARs. (*Id.* at 364.) Although Kelley had worked on other investigations prior to being assigned to assist Willman, this was the first time she had been assigned to be the lead ABC accountant in charge of preparing an analysis, as she had only been with the ABC a little over six months. (*Id.* at 428–29.) The information Kelley had to work with in completing her task was incomplete, unauthenticated, and worst of all supplied by Shofner.[47] Kelley had the MBARs which had been provided by the Virginia Beach Jewish Mother to the ABC, and cash register tapes which were provided by Shofner and which Shofner alone had represented to be from The Jewish Mother's cash registers, and supposedly also handwritten daily sheets, which were also provided and verified only by Shofner.

**47.** Unfortunately, defense counsel has been unable to provide all of the information relied upon by Kelley in conducting her analysis. In many ways, and in particular with regard to information concerning Kelley's analysis, the Court is of the opinion that the defense in this case is a defense of confusion. Defendants have certainly provided interesting answers to the Court's inquiries into their failure to provide documents pursuant to the Court's orders. In its July 9, 1999 Order, the Court ordered that the parties provide a list of records, including the following:

  ✻ ✻ ✻ ✻ ✻ ✻

  3. the cash register receipts produced by Deborah Shofner ("Shofner") prior to obtaining the search warrants on April 1, 1994,

  ✻ ✻ ✻ ✻ ✻ ✻

  5. The written analysis of the cash register tapes referred to on page 159 of Willman's deposition, including the date the analysis was prepared, who prepared the analysis, and the date the analysis was given to Willman,

  ✻ ✻ ✻ ✻ ✻ ✻

  8. a copy of the analysis prepared by Valerie Kelley, including the date the analysis was prepared and the date the analysis was given to Willman,

  ✻ ✻ ✻ ✻ ✻ ✻

Unfortunately, defense counsel did not comply with this order. Instead of submitting the cash register receipts as requested in item three, defense counsel submitted handwritten daily receipts for December 1993—not for November 1993, the time period covered by Kelley's so-called analysis. Thus, the Court has no documents from November 1993 that would support Kelley's conclusion that The Jewish Mother was under-reporting. Moreover, the handwritten documents in response to item three which were for December 1993 did not contain any figures concerning "mysterious money," "system shut-off," or "cover charges." Since those figures were not on the handwritten daily sheets for December, it is likely that such figures probably were not on the handwritten figures for November 1993 either unless they were added by Shofner. In fact, not one document, other than the results of Kelley's analysis, has been submitted to the Court that would show a foundation for the figures referred to as "system shut off" or "cover charges." The Court must conclude that the belief in the validity of these figures was based only on the word of Deborah Shofner.

Defense counsel also did not include any information for item number five. When questioned about this and other omissions at the evidentiary hearing, counsel represented that they felt the information requested in item five was adequately produced in item eight, and in an effort to avoid unnecessary duplication, they therefore presented the information only under item eight. While defense counsel's rationale for including this information under item eight instead of item five is itself questionable, the fact remains that even item eight did not completely comply with the Court's Order. The date the analysis was prepared was not reported, nor were any handwritten materials provided to show how the so-called analysis figures were obtained.

(*Id.* at 366–67, 377, 402.) Kelley knew the seating capacity of the restaurant from the MBARs, but she did not know the amount of the average check per person at the restaurant. (*Id.* at 385.) The cash register tapes showed a running daily total for the restaurant, represented by the notation "GRP Total." Kelley compared the cash register tapes Shofner had given her with the handwritten daily sheets also allegedly provided by Shofner. (*Id.* at 381.) No comparison was made to any national standards like those utilized by the restaurant industry. (*Id.* at 382.)

Using the tapes and daily sheets, Kelley prepared a document that summarized what she believed to be the total monetary intake by The Jewish Mother for the period of November 9, 1993 through November 23, 1993. (*See* E.H. Ex. Vol. I, tab 8.)

This document supposedly summarized the daily receipts of the restaurant broken down into daily cash and checks, daily cash register totals, cover charges, and "system shut off."[48] Kelley took the A.M. and P.M. receipt totals, and added to them figures representing cover charges and "system shut off" which evidently had been provided by Shofner.[49] (E.H. Tr., Vol. II at 400.) Based on the documents she reviewed and the information from Shofner, Kelley concluded that The Jewish Mother was under-reporting as much as $8,000 to $10,000 per day, and a total of up to approximately $77,000 for the fifteen-day period between November 9, 1993 and November 23, 1993.[50] (*Id.* at 397, 418.) The cover charge figures Kelley used in her analysis, ranged as high as $8,345.68 on one particular night.[51] Kelley figured that from November 9, 1993 to November 23,

48. It is unclear why "cover charges" and "system shut-off" were included in this analysis. These figures were not on the cash register tapes, and they do not appear on the December handwritten documents. No one at the evidentiary hearing was able to explain what "system shut-off" referred to. Apparently, this figure referred to the amount of money that was taken in while the cash registers were shut off. Shofner told Kelley that the alleged skimming was accomplished by simply not ringing sales items into the cash register. (E.H. Tr., Vol. II at 420–21.) Because these items were not rung into the cash register, the only record of these "system shut-off" figures was the handwritten receipts provided and verified only by Shofner. There

were no bank deposits reflecting any sums that could possibly have come from the so-called "system shut-off" or "cover charges."

49. At this point, everyone around Kelley had led her to believe that what Shofner had reported was corroborated and verified and that she was telling the truth. (E.H. Tr., Vol. II at 401.)

50. Assuming Kelley's analysis was correct and that The Jewish Mother had failed to report $77,000 for the relevant two week period, extrapolating that over a 50 week period, which allows for closings due to holidays and weather, according to Kelley, The Jewish Mother would have been under-reporting $1,925,000 per year.

51. The cover charges reported in the handwritten, unverified information provided by Shofner and reflected in Kelley's analysis for the 15–day period are provided below. The daily cover charges, assuming 200 customers entered the restaurant by paying cover each of those 15 nights, are also provided below.

| | | |
|---|---|---|
| Tuesday, November 9— | $1755.00 divided by 200 = | 8.78 per person |
| Wednesday, November 10— | $1904.23 divided by 200 = | 9.52 per person |
| Thursday, November 11— | $ 0.00 | |
| Friday, November 12— | $2747.97 divided by 200 = | 13.74 per person |
| Saturday, November 13— | $1888.27 divided by 200 = | 9.44 per person |
| Sunday, November 14— | $ 0.00 | |
| Monday, November 15— | $ 0.00 | |
| Tuesday, November 16— | $ 0.00 | |
| Wednesday, November 17— | $3776.54 divided by 200 = | 18.88 per person |
| Thursday, November 18— | $8345.68 divided by 200 = | 41.73 per person |
| Friday, November 19— | $3396.98 divided by 200 = | 16.98 per person |
| Saturday, November 20— | $ 0.00 | |
| Sunday, November 21— | $ 0.00 | |
| Monday, November 22— | $ 0.00 | |
| Tuesday, November 23— | $1755.00 divided by 200 = | 8.78 per person |

1993, The Jewish Mother brought in more than $25,000 in cover charges alone. For a 200–seat restaurant that usually charges two to three dollars cover, and at most, around ten dollars for cover, $25,000 represents an extraordinarily high figure for a fifteen-day period.[52] According to Kelley, Shofner told her the skimming was being accomplished by not ringing sales items into the cash register. (*Id.* at 420–21.) Kelley concluded, based on the undocumented material provided by Shofner, that during the fifteen-day period, the restaurant brought in more than $31,000 with the system "shut-off," and thus, unreported. Kelley believed The Jewish Mother could be utilizing this practice to skim $150,000 a month. (*Id.* at 421.) Despite the obvious enormity of these figures for a restaurant the size of The Jewish Mother, Kelley's results did not strike her as odd, (*Id.* at 378–79.), despite the fact that apparently no bank deposits and no wire transfers reflected this alleged skim. Only Deborah Shofner's handwritten notes, not made available to the Court, may have reflected such a skim. There is nothing in the record to support the figures in Kelley's so-called analysis. On the contrary, in the handwritten records proffered to the Court pursuant to its Order of July 9, 1999, under item three, the records for December showed no figures whatsoever for "system shut-off" or any substantial "cover charges." A jury could easily conclude that Kelley's analysis was not based on objective or independently verified evidence, but instead consisted only of adding together and restating figures provided by Shofner and possibly her supervisors. Moreover, a jury could find that the analysis was prepared with a view toward substantiating Shofner's claims of under-reporting, not with a view of independent, impartial analysis, and that the analysis was undertaken not to discover the truth,

but to justify action against the Plaintiffs. This conclusion is supported by the fact that the only documents that were not handwritten, the cash register tapes, showed sales for the fifteen-day period that when extrapolated over an entire year, would approximate the sales figures shown in the tax returns filed by Mom's during that time period. Moreover, the December handwritten documents did not include any figures for "system shut-off" or excessive "cover charges."

## C. Bennis' Investigation

In addition to looking at Kelley's so-called analysis, Willman also spoke with Bennis about his efforts to either confirm or refute the information provided by Shofner. (Willman Decl. ¶ 2.) One of Bennis' responsibilities was to take photographs of all locations for which the IRS was going to seek warrants. Initially, the IRS was planning to seek warrants for both Jewish Mother restaurants, the storage facility Shofner claimed belonged to Mom's, Colaprete's residence, Miller's residence, and Bonk's residence. Shofner provided addresses for all three residences. Bennis merely went out and took pictures of the locations to verify that there were in fact residences at the addresses Shofner had provided.[53] (E.H. Tr., Vol. II at 268, 270.) Bennis also took a picture of the storage unit that Shofner claimed belonged to Mom's, but he did not check to see if the unit actually belonged to Mom's. (*Id.* at 271.) Instead, after going out to the storage facility and seeing several cars in front, Bennis told Shofner what cars he had seen and then asked her if those cars were used by persons associated with The Jewish Mother. Not surprisingly, Shofner said they were:

> THE COURT: You didn't ask her to identify the vehicles that the Jewish

---

52. Even if 200 persons paid cover each of the fifteen nights included in Kelley's analysis, to bring in more than $25,000 that cover would still have to be more than $8.00.

53. Willman did check the addresses of Bonk, Colaprete, and Miller with the Division of Motor Vehicles ("DMV"). However, Willman's DMV search could not confirm a home

Mother used all the time? You just said, I see this vehicle and that vehicle, and she then said those were the vehicles?

THE WITNESS: Yes, sir.

(*Id.* at 327.) This sort of identification is clearly rejected by every court in the land. Moreover, the affidavit indicated that Mom's was billed sixty-six dollars per month for the storage unit, (*see* Search Warrant Aff. at 7.), and that Bennis went there. While Bennis may have gone to the storage unit and taken pictures of it, obviously, he never asked those who ran the storage facility whether Mom's was being billed for the storage unit, which it was not.

Bennis also ran Colaprete, Miller, and Bonk's names through the Drug Enforcement Administration's computerized record keeping system called NADDIS. (Bennis Dep. at 20; Bennis Decl. ¶ 14.) Bennis claimed that the NADDIS search produced an "extensive" file on the Mom's principals. (Bennis Dep. at 20.) In actuality, the results could hardly be characterized as extensive. The NADDIS search revealed that in November 1987 Miller pled guilty to a charge of possession of cocaine with intent to distribute, and that someone had told the DEA that Colaprete had been in Negril, Jamaica in 1979 to oversee a cocaine shipment.[54] (*Id.*; E.H. Tr., Vol. II at 285; E.H. Ex. Vol. II, tab 13.) Bennis did not find any information about Bonk in the NADDIS database. The remainder of the information provided by the NADDIS search which Bennis referred to as "excessive" did not pertain to any of the Plaintiffs but instead referred to other individuals not associated with The Jewish Mother.

Bennis also telephoned his friend Dale Smith of the Virginia Beach Police Department and asked whether the Virginia Beach police had any open investigations or outstanding warrants on Shofner.

(E.H. Tr., Vol. II at 277–78.) Smith told Bennis there were none. (*Id.*) According to Bennis, he was not comfortable calling departments of the Virginia Beach Police, because he was afraid that some Virginia Beach police officers were friends with The Jewish Mother principals, and that they would inform the principals that the ABC and IRS might be seeking search warrants. (*Id.* at 319–320.) He believed the latter to be true because Shofner stated that the Mom's principals had contacts in the Virginia Beach Police Department.[55] (*Id.* at 319.) Accordingly, the Virginia Beach Police were not included in The Jewish Mother investigation in any meaningful way. When Bennis called Smith, he did not tell Smith that Shofner was suspected of embezzlement, and he did not inquire specifically about whether the financial investigation section of the police department had any information on Shofner. (*Id.* at 277–78.) Thus, Smith did not check the database maintained by the Economic Crimes Unit into which Werle had already entered Shofner's name. (*Id.*)

Bennis did contact the Virginia Beach Commonwealth Attorney's Office, but they too reported that they had no open investigation with regard to Shofner. (*Id.* at 279.) Bennis did not contact Shofner's probation officer Farashahi, nor did he contact the Norfolk Commonwealth's Attorney, who according to Farashahi, was also investigating Shofner. Since Shofner claimed to have forged Berger's signature on the management agreement between Mom's and Donaline, Bennis did have Shofner write Berger's name. (Willman Dep. at 126.) Bennis passed this information on to Willman. A jury could conclude that very little if any credence whatsoever was placed on the accusation of embezzlement and that the affidavit reflects this by omitting the accusation from the credibility section.

address for Bonk, since he was in the process of moving at the time.

54. It is not known who supplied the information contained in the NADDIS report.

55. A jury could conclude that Bennis and the others accepted whatever Shofner said.

## D. Other Investigation

In addition to the efforts of Kelley and Bennis, Willman ran a search through the NCIC database on Bonk, Miller, Colaprete, and Shofner. From the NCIC Willman learned that Shofner had been convicted in 1988 of uttering a false check. (Willman Dep. at 55–56.) This conviction was different from the one that Shofner had told Willman about. (*Id.*) Shofner had only informed Willman that she was on probation for a federal credit card fraud conviction in Florida. In addition to running a NCIC check, at some point in this time frame, Dunford gave Willman The Jewish Mother's MBARs and explained what in his opinion was their significance and how a markup analysis was performed. (E.H. Tr., Vol. III at 708.) Willman did not know how to interpret the MBARs on her own. (E.H. Tr., Vol. III at 680.) According to Willman, Dunford told her that the MBARs showed that a "substantial amount" was being under-reported by The Jewish Mother. (*Id.* at 709.) Dunford also gave Willman a copy of the letter from Gray to Kelley and thus, she was aware that Mom's had accused Shofner of embezzlement. (*Id.* at 662.) ABC defendant Altman also described the MBARs to Willman. (Willman Dep. at 63–64.)

No one involved in the investigation ever contacted the Norfolk Commonwealth Attorney's Office. (E.H. Tr., Vol. II at 280.) If they had, they would have learned that Colaprete and Miller had called that office with charges of embezzlement against Shofner. Furthermore, despite the obvious questions about Shofner's reliability, and the knowledge that Shofner was a convicted felon under federal supervision, no one ever contacted Shofner's probation officer, Mary Farashahi, prior to seeking the search warrant. (*Id.* at 110–11.) Nor did anyone contact D.B. Gray about the letter he sent to the ABC, (E.H. Tr., Vol. III at 547), or Detective Werle about the investigation he had begun. Neither Willman nor anyone else checked to see if Shofner was in fact a CPA as she had represented herself to be. Finally, no one

ever informed Mom's attorney Sullivan Callahan that there was any problem with Mom's acquisition and operation of the Colley Avenue location. Callahan even contacted Santana two days prior to the execution of the search warrants and inquired as to whether The Jewish Mother had any problems and whether Santana was going to file a violation report. (E.H. Tr., Vol. IV at 808–09.) Santana told Callahan that he did not think there would be any problems, "since they were just winding down one corporation, starting up another." (*Id.*) Santana did not tell Callahan that Berger claimed the management agreement had been forged. Callahan asked Santana to give him a call if there were any problems. (*Id.*) Callahan never received a call.

## E. Preparing the Search Warrant Affidavit

With the so-called analysis provided by Kelley, the erroneous information from Bennis that the Virginia Beach Police were not investigating Shofner, the incongruous statements of Dunford, the lies of Shofner, as well as the information gleaned from Willman's NCIC search, after returning to Norfolk Willman finished drafting the affidavit in support of the application for a search warrant. (Willman Decl. ¶ 10.) The drafting of the affidavit involved several people and began on March 31 and took nearly all of April 1, 1994. Throughout the process of drafting the affidavit, Willman communicated with two individuals at the IRS—IRS defendant and Willman's supervisor Cheryl Kast, and IRS attorney John McDougal ("McDougal"). Willman reported back to Kast throughout the day on April 1 as information was being gathered and the affidavit was being written. (E.H. Tr., Vol. III at 573.) Kast states that she spoke with Willman about what she was doing with regard to debriefing Shofner, making sure Willman was obtaining the information she needed to put in the affidavit, and making sure Willman was contacting IRS attorney McDougal to ensure that she had probable cause. (*Id.*) According to Kast, she was "oversee-

ing the obtaining of the warrant, not physically working on obtaining the information for the warrant." (*Id.*) Kast got approval for the search warrants from her supervisor, and reviewed the final affidavit. However, in reviewing the final affidavit, she did so "basically to make sure that ... everything was in there that was needed, and that John McDougal had reviewed the affidavit for search." (*Id.* at 575.) Kast did not review any of the materials Willman relied on in writing the affidavit. (*Id.* at 636–37.) In addition, she did not see any of the documents prepared by Kelley, or any of the materials provided to Kelley by Shofner. (*Id.* at 593.) However, Kast knew about the letter from Gray to Kelley, and she knew that the Mom's principals had accused Shofner of embezzlement. (*Id.* at 635.) Moreover, as Willman's supervisor, she certainly knew Willman's qualifications.

IRS attorney John McDougal also did not see any of the materials Willman used to draft the affidavit. As an IRS attorney, his role was to review search warrant affidavits. (E.H. Tr., Vol. II at 173–74.) On April 1, 1994, Willman faxed McDougal two copies of the affidavit as she was in the process of writing it. (McDougal Aff. ¶ 3.) McDougal reviewed the affidavit for probable cause, and discussed the matter with Willman. (McDougal Aff. ¶¶ 3, 4.) He believed the single most persuasive fact supporting Shofner's story was that she was admitting facts against her penal interest. (E.H. Tr., Vol. II at 181.) However, at the time he reviewed the affidavit, McDougal was not aware of Shofner's previous criminal conviction, nor was he aware of the embezzlement charges being levied against Shofner by Mom's. (McDougal Aff. ¶ 7.) Nor was he aware that there was really no penal interest involved. A jury could easily conclude based on the testimony of Bennis and the actions and testimony of Santana that the ABC violations Shofner described were administrative law violations, and did not and would not result in

any criminal actions. Furthermore, Shofner was not involved in any tax fraud for the returns prepared and filed before she came to work or for the returns not yet filed. Like FBI agents Scheiner and O'Brian, McDougal found the allegations of drugs at The Jewish Mother to be implausible, but advised Willman to include that information in the affidavit so that the magistrate could draw his own conclusion. (McDougal Aff. ¶ 8.) Willman did not feel there were any drugs to be found by the search, but she did not disclose this fact to the Magistrate.

The final affidavit which Willman signed and presented to Magistrate Judge Miller was rife with inconsistencies and misrepresentations. In the affidavit, Willman claimed that there was probable cause to suspect that tax crimes had been committed by Mom's. She stated that she based her conclusion upon information provided by the ABC agents, the MBARs, Shofner, and her experience. (Search Warrant Aff. at 4.) [56] The first two pages of the affidavit were devoted entirely to a description of Willman's experience and expertise. She stated that as a special agent, her responsibilities included participating in investigations which "involve analyzing an individual's or *business* ' books and records ....' " (Search Warrant Aff. at 1) (emphasis added). In reality, this was Willman's first investigation of a business. (Willman Dep. at 89–90.) Willman also represented that she had

> attended various in-service training seminars, including narcotics seminars, money and banking seminars and money laundering seminars. These seminars concentrated on the application of investigative techniques used in conducting criminal investigations involving money laundering, narcotics trafficking, and related offenses.

(Search Warrant Aff. at 2.) She continued:

> Based on the experience of your affiant, her accounting degree, her extensive

56. The affidavit submitted in support of the search warrants contains both typed and handwritten page numbers. Throughout this order, all page references regarding this affidavit will refer to the handwritten numbers.

training while employed with the Internal Revenue Service, and the information contained in this affidavit, she has probable cause to believe that violations of Federal Criminal Law, to wit: 26 United States Code, Sections 7201 and 7206(1), have been committed . . . .

(*Id.*) Later in the affidavit, she again referred to her experience to add credibility to the affidavit, noting:

Based upon you affiant's training, experience and participation in other investigations involving tax evasion and money laundering, she knows . . .

\*   \*   \*   \*   \*   \*

4.  That restaurant/bar owners holding valid liquor licenses, but, who are not in compliance with the food/sales ratio as set forth in the state liquor laws, maintain evidence of false and fraudulent sales and expense reports, such as, monthly sales summaries and purchase invoices, which are used to mislead Alcoholic Beverage Control investigators while all the while maintaining true and correct sales and expense reports for their managing use;

5.  That restaurant/bar owners falsifying mixed beverage annual review reports and filing them with the Department of Alcoholic Beverage Control, also falsify the entities' income tax returns and file them with the Internal Revenue Service.

6.  That restaurant/bar owners amassing large quantities of currency from sales of alcoholic beverages and door cover charges, falsify records and divert a portion of said currency to their personal use.[57]

(*Id.* at 4–5.) At the evidentiary hearing, Willman could not recall one investigation she had worked on which involved money laundering or skimming. (E.H. Tr., Vol. III at 683.) Moreover, she stated that prior to this investigation, she had only participated in one prior investigation involving a restaurant. (*Id.* at 679.) In that

case, she was not even assigned to the investigation, and only gave a "limited amount" of assistance. (*Id.*) Between graduating from college and drafting this affidavit, Willman had not participated in any seminars, courses, or training of any kind with regard to accounting or auditing. (Willman Dep. at 12.) In fact, at the time of the investigation, Willman usually relied on revenue agents in her investigations to conduct the technical, bookkeeping-type activities. (*Id.*) Clearly, Willman overstated her experience in the affidavit.

In addition to overstating her experience, Willman also stated in the affidavit that she had independently analyzed the financial records provided by Shofner. Specifically, she stated that:

DS [Shofner] provided to the affiant records she had in her possession that confirms her allegations. These records were analyzed by the affiant and an accountant with ABC's Financial Investigations Section. These records revealed large sums of "skimmed" receipts and a pattern of money laundering.

(Search Warrant Aff. at 8.) There was not a scintilla of evidence of money "laundering" other than that bald assertion by Shofner. At the evidentiary hearing, Willman admitted that she did not make a comparison of the records provided by Shofner, but that she only reviewed the analysis that was done by Valerie Kelley. (E.H. Tr., Vol. III at 675.) Willman, like Kelley, did not find the cover charges that were reported in the information provided by Shofner to be odd. (*Id.* at 677.) Willman had no idea what the actual cover charges were for the restaurant. Had she bothered to ask Bennis, whom Dunford supposedly had relied on for pricing information, she would have discovered that the cover charges Kelley was using in her analysis were ludicrous. Not only did Willman not know what the cover charges were, she had no idea how many seats

---

57.  In fact, there was no evidence of the last 15 words of number four, no evidence of the last 15 words of number five, and no evidence

of the last 13 words of number six. Willman and the IRS apparently have strong feelings about restaurant owners.

there were at The Jewish Mother, or what revenue would normally be generated by each seat in the restaurant. (*Id.*) She did not look to any national restaurant publications for any guidance as to what amount of business a restaurant the size of The Jewish Mother would typically do. Willman relied on whatever was told to her by ABC agents Kelley and Dunford. (*Id.* at 675.)

Willman did look at The Jewish Mother's tax returns for 1990, 1991, and 1992.[58] (*Id.* at 721; Search Warrant Aff. at 18.) Although she did not have The Jewish Mother's 1993 tax return at the time, she compared The Jewish Mother's 1992 tax return to the figures Kelley arrived at in her analysis of fifteen days in November 1993. (E.H. Tr., Vol. III at 701.) If Willman had known what amount of business a typical restaurant the size of The Jewish Mother would do in a year, she would have seen that there was no way the owners of The Jewish Mother could have been skimming the amounts Shofner claimed they were skimming. According to Willman, her entire basis for concluding that there was a substantial amount of under-reporting at The Jewish Mother came from Kelley's so-called analysis, Dunford's interpretation and explanation of the MBARs, and Shofner's allegations.[59] (*Id.* at 720.)

Willman relied on whatever Shofner told her, despite the fact that she had been informed that Shofner had been accused of embezzlement and fired by Mom's. Willman believed that Shofner was telling the truth, and in writing the affidavit, she tried to convey that belief to the magistrate. (*Id.* at 696.) Shofner told Willman that she had been instructed to maintain two sets of books, that the owners were skimming from the restaurants, and that the owners were laundering money through The Jewish Mother. The only evidence Shofner provided to support these accusations were some recent cash register tapes, which proved nothing, and handwritten material covering a fifteen-day period in November which allegedly proved something, despite the fact corresponding handwritten records from December contained no figures for "system shut-off" or excessive "cover charges." Shofner also stated that she had observed a large quantity of cocaine in the Virginia Beach Jewish Mother restaurant. This information was all included in the affidavit. Despite the fact that Willman did not expect to find drugs at the restaurants or on Colaprete's property, (E.H. Tr., Vol. III at 695, 702.), she stated in the affidavit that there was probable cause to believe that a search of all of the premises listed to be searched would lead to the discovery of "narcotics and other illegal controlled substances, including cocaine and marijuana and paraphernalia for packaging, cutting, weighing, and distribution." (Search Warrant Aff. at 21.)

While Willman did include information concerning the drugs, which she apparently did not believe, in addition to a large amount of other uncorroborated information from Shofner in the affidavit, Willman failed to include in the affidavit information that damaged Shofner's credibility. Specifically, Willman knew that Shofner had been accused of embezzlement and fired from Mom's. This information was

---

**58.** Interestingly, The Jewish Mother's MBARs for the relevant time period were markedly similar to its tax returns for the matching years in gross receipts. In 1990, on its federal tax return Mom's reported gross receipts of $1,613,619. In 1991 Mom's reported $1,781,349. In 1992 Mom's reported $2,010,959 in gross receipts. Thus, for the three years of tax returns Willman examined, The Jewish Mother reported gross receipts of $5,405,927. For the matching MBAR years, The Jewish Mother reported MBAR receipts of $5,461,817. The slight difference between the two figures can possibly be explained by the fact that tax return filings are done based on a calendar year, while the reporting year for The Jewish Mother's MBARs was February to January. The only information Kelley had to show that The Jewish Mother was under-reporting was the handwritten information supposedly provided by Shofner. No bank deposits, wire transfers, or excessive cash was ever shown to exist.

**59.** Willman mistakenly believed that Kelley was a CPA. (E.H. Tr., Vol. III at 693.)

not specifically included in the affidavit.[60] (*Id.* at 633, 694.) A jury could conclude that all of the investigators did not believe the embezzlement allegation being levied against Shofner and therefore decided not to indicate those allegations in the affidavit. Evidently Shofner must have denied the principals' allegations, but there was no showing in the search warrant affidavit, and there has been no showing to date that Shofner was ever even questioned concerning the allegation. Defendants argue that the charges were contained in the search warrant affidavit in the following passage:

On March 28, 1994 Mr. D.B. Gray, CPA telephoned ABC Special Agent W.D. Altman that he had recently been retained to complete the Mixed Beverage Annual Review (MBAR) report for MOM'S INC. T/A/ The Jewish Mother located in Virginia Beach. He further advised that the owners had received a written warning from ABC regarding the MBAR being late and he needed an extension because the bookkeeper had not filed the report as required. He said the owners suspected some type of embezzlement and implicated the previous bookkeeper. Mr. Gray faxed a letter restating the conversation with Agent Santana and advised him of this information. Agent Santana on March 29, 1994 went to the home of Deborah Shofner (DS) the former bookkeeper and CFO of MOM'S, INC. to interview her regarding her involvement with MOM'S, INC.

(Search Warrant Aff. at 7.) Willman also did not include in the search warrant affidavit the fact that Shofner had a 1988 conviction for uttering false checks, though she was aware of this fact.

After finishing the affidavit, on the evening of April 1, 1994, accompanied by Bennis and Santana, Willman took the affidavit and the proposed warrants to the home of Assistant United States Attorney Laura Everhart. Willman had faxed Everhart several copies of the affidavit throughout the day. (E.H. Tr., Vol. II at 144.) Everhart reviewed the documents, and noticed that the warrants did not seek permission to search for narcotics, guns, and safes, even though references to those materials had been made in the affidavit and Willman had stated in the affidavit that they would probably find not only cocaine and marijuana, but also "paraphernalia for packaging, cutting, weighing and distribution." Everhart felt the affidavit supported probable cause to search for narcotics, weapons, and safes. (Everhart Decl. ¶ 3.) Therefore, since it was late in the evening and there was no accessible printer, Everhart, Willman, and Bennis handwrote on every warrant, and copy thereof, the words "narcotics, guns, and safes." [61]

60. Willman did include in the affidavit the fact that Mom's owners "suspected some type of embezzlement and implicated the previous bookkeeper." (Search Warrant Aff. at 7.) However, Willman did not refer to Shofner by name, even though she and the other agents involved understood Gray's letter about embezzlement by a former bookkeeper to be referring to Shofner. Notably, at all other points throughout the affidavit Willman referred to Shofner either as "witness" or by the initials "DS." The reference to the alleged embezzlement by the previous bookkeeper is the one time in which Shofner is not referred to by name. At the evidentiary hearing, Willman claimed that she did not refer to Shofner by name in this instance because she was trying to relay the information to the magistrate in the same way it came to her. (E.H. Tr., Vol. III at 660–61.) However, at other times in the affidavit she had no problem in presenting her conclusions to the magistrate instead of just relaying the information as it came to her. A jury could find that Willman deliberately neglected to refer to Shofner by her initials or as "witness" in this instance because the facts damaged Shofner's credibility. Moreover, in the section labeled "Credibility of Witness" in the affidavit, where the allegation of embezzlement would be of paramount importance to the magistrate, no mention was made of the embezzlement allegation. Instead, it was wrongly indicated that because of her allegations, Shofner faced "criminal penalties" and any pending charges for keeping the books. It is true Shofner would face parole revocation as stated in the affidavit, but for embezzlement, not for keeping The Jewish Mother's books.

61. According to Bennis and Willman, Santana waited in the car at both Everhart's and Judge Miller's houses. (Bennis Aff. ¶¶ 23, 31; Willman Decl. ¶¶ 14, 18.) Everhart also reports that only Willman and Bennis came to her house. (Everhart Decl. ¶ 3.)

(Bennis Aff. ¶ 24; Everhart Decl. ¶ 7; Willman Decl. ¶ 15.) Unfortunately, Everhart never contacted Farashahi, nor was she provided with the information in Willman's possession that raised doubts about Shofner's credibility. Apparently, Everhart did not ask Willman if Willman believed there to be cocaine on the premises to be searched, because if she had asked, presumably Willman would have told her that she did not. Willman, Bennis, and Santana then proceeded to Magistrate Judge Miller's house, where he signed the warrants after reviewing what he believed to be an accurate affidavit, not a misleading and inaccurate one. (Bennis Aff. ¶ 31.)

### F. Execution of the Warrants and Post–Raid Events

At 6:00 a.m. Saturday, April 2, 1994, the day before Easter Sunday, IRS agents, ABC agents, and other law enforcement officials including Bennis met at the ABC's Chesapeake office to execute the search warrants. (E.H. Tr., Vol. II at 297–300.) ABC defendant Altman had arranged for ABC personnel from the Hampton, Virginia and Chesapeake ABC offices to participate in the raids. (*Id.* at 445–46.) He passed the names of those agents on to IRS defendant Kast at the offices of the ABC, who, with Altman, assigned the personnel to the various locations to be searched. (*Id.*)

The raids were conducted just after the Norfolk and Virginia Beach Jewish Mother restaurants opened for breakfast. Shortly after 9:00 a.m., plaintiff Bonk and six or seven customers were at the Colley Avenue location when eight or nine armed law enforcement officers entered the restaurant and proceeded to search the premises. (Bonk Dep. at 81, 84, 88.) The search at the Colley Avenue location lasted until around 1:00 p.m. (Bonk Dep. at 88.)

At the same time agents were searching the Colley Avenue location, Kast, Willman, and Bennis accompanied a group of eight

to ten armed IRS and ABC agents to the Virginia Beach Jewish Mother. (E.H. Tr., Vol. II at 339.) Fifteen minutes before the raid at the Virginia Beach restaurant, Bennis and ABC agent Burgess went into the restaurant and proceeded to act like customers. (Bennis Dep. at 39–40.) There were approximately ten customers in the restaurant at the time. (*Id.* at 40.) After the raid began, Bennis went with Willman upstairs to look for the second set of financial books Shofner had described while other agents searched the downstairs area. (Willman Dep. at 165.) Upstairs they found a pile of financial records in the middle of the floor. (E.H. Tr., Vol. II at 302.) They did not find a second set of books. (Willman Dep. at 158.) In all, the search at the Virginia Beach location lasted from approximately 8:30 a.m. until about 3:00 p.m. or 4:00 p.m. (*Id.* at 153–54.) The search totally disrupted the restaurant's operation.

While the restaurants were being searched, agents simultaneously searched the homes of Miller and Colaprete as well. There was no one home at Colaprete's house at the time of the search except Colaprete's two dogs.[62] For the protection of the agents, the dogs were impounded during the execution of the warrants but were ultimately returned to Colaprete. Defendants seized a locked safe from Colaprete's house. The safe allegedly contained, among other items, his gold watch.

Miller was in the shower when more than ten armed agents arrived to conduct a search of his house. (Miller Dep. at 65–68.) He was greeted in the shower by an agent who had his gun drawn. The agent told Miller to get dressed, and then escorted Miller downstairs. (*Id.* at 65–71.) His twelve year-old son was home at the time, as was his daughter and two of her girlfriends who had spent the night. (*Id.* at 65–74.) According to Defendants, because Bonk was in the process of moving, a

---

**62.** Colaprete was in Jamaica at the time, where he had been since March 30. (Bonk Dep. at 76–77.)

search warrant was never obtained for his house and it was never searched.

After searching the Virginia Beach Jewish Mother, Willman and Kast went to D.B. Gray's office. (Willman Dep. at 161; E.H. Tr., Vol. III at 635.) Gray was not there at the time. (E.H. Tr., Vol. III at 557.) They did not have a search warrant for Gray's office, but they requested that they be given any records Gray had concerning the Virginia Beach Jewish Mother. (*Id.;* Willman Dep. at 161.) On Monday or Tuesday following the raids, Bennis returned to Gray's office with a subpoena, not a search warrant, for the documents, (Willman Dep. at 161), which Gray then turned over. (E.H. Tr., Vol. III at 557.) Agents also proceeded to search the storage facility Shofner had told them belonged to Mom's. However, when they arrived at the storage facility, they discovered that the unit was rented by someone completely unrelated to Mom's. (E.H. Tr., Vol. II at 336.) [63]

In all, the quantity of material seized from the two Jewish Mother restaurants, which included computers, cash registers, as well as business documents and papers from the restaurants and from the homes of Colaprete and Miller, was voluminous.[64] The materials were placed in a panel truck, which was then driven from the Tidewater area to Richmond, Virginia, approximately one hundred miles away. There the materials were stored in ABC facilities.[65] (E.H. Tr., Vol. I at 67.) ABC agent Dunford was placed in charge of the materials. (*Id.*) At some point, at the request of an United States Attorney, ABC agent Dunford accessed Colaprete's safe

while it was still in storage. (*Id.* at 30–31.) Willman also examined the safe's contents after returning from her seminar. (Willman Decl. ¶ 25.)

Following the raids, Shofner was taken into protective custody. There is a question as to whether she was placed in federal custody or the custody of the ABC. According to Shofner's probation officer, Mary Farashahi, she met with Shofner, Bennis, and Altman on Tuesday, April 5. (E.H. Tr., Vol. II at 116.) Farashahi claims that at that meeting, she was told that Shofner was going to be placed into federal custody after she testified before a federal grand jury. (*Id.* at 117, 123–24.) Werle claims to have also been told that Shofner was going to be placed into federal custody. (Werle Dep. at 32–33.) On the other hand, IRS defendant Willman claims that the "IRS did not have anything to do with keeping up with Ms. Shofner at all at any time." (Willman Dep. at 175.) Furthermore, Farashahi claims that contrary to what she was told at her April 5 meeting with Shofner, Bennis, and Altman, as of April 13, 1994, she had been told by an Assistant United States Attorney that no federal agency was involved in the case at that point, and that Shofner was being harbored by the ABC. (E.H. Tr., Vol. II at 244–45.)

Immediately following the raids, there is evidence to suggest that the agents involved were aware that Shofner had not provided accurate and truthful information. At Farashahi's April 5 meeting with Shofner, Altman, and Bennis, Altman told Farashahi that he was aware that Shofner was undergoing treatment and asked Far-

63. This total fabrication apparently caused some of the agents to become suspicious of Shofner's story, but nevertheless, the agents continued to pursue an investigation based on the information Shofner had provided, and as will be seen below, the ABC even took Shofner into protective custody.

64. Agent Willman estimates that the IRS seized between 150 and 200 boxes of materials. (E.H. Tr., Vol. III at 681.)

65. According to Kast, the seized records were sent to Richmond because the IRS did not

have space in Norfolk and because the IRS agents were going to be out of town at training during the week following the raids. (*Id.* at 582.) The Court notes that there are probably more federal facilities located in the Tidewater area that could have been used to store the seized materials than any other comparably-sized area in the United States. A jury could easily conclude that the IRS was not in charge at all and that the ABC, specifically Dunford, was calling all the shots.

ashahi if Shofner had been diagnosed as a compulsive liar. (*See* E.H. Ct. Ex. 1.) Farashahi told him that Shofner was receiving treatment for having difficulty in determining the truth, and she warned Altman to be careful with Shofner and to verify all information she gave him. (E.H. Tr., Vol. II at 127.) This was the first time Farashahi had spoken with anyone from the ABC about Shofner. (*Id.* at 254.) In addition to Altman's inquiries into Shofner's credibility, two days after the raids Bennis called Detective Werle and questioned him about his investigation of Shofner. (Werle Dep. at 29–30.) Werle continued his investigation into Miller and Colaprete's charges of embezzlement against Shofner after the raids. Shofner was eventually charged, and pled guilty to embezzling from The Jewish Mother.

Approximately three weeks after the IRS agents returned from their training at Quantico and four weeks after the raids, the seized records were transferred from the ABC facility in Richmond to the SMA building in Norfolk, which was directly across the street from the IRS office.[66] The investigation supposedly continued for five months. No criminal charges were ever brought, and the investigation was eventually discontinued after the IRS concluded that it did not have enough evidence to do anything. (E.H. Tr., Vol. III at 622.) The seized items were finally returned to Mom's, Miller, and Colaprete more than five months after the raids. (Willman Dep. at 162.) Colaprete now claims that his gold watch is missing and was removed from his safe by those in charge of the seized materials. He also claims that his dogs' dispositions have not recovered since they were impounded during the search.

## II. *LEGAL ANALYSIS*

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment should

be granted where "the pleadings, depositions [and] answers to interrogatories ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has construed Rule 56(c) to "mandate the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court explained that, "[i]n such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The non-moving party must demonstrate that there are specific facts which create a genuine issue for trial. *See Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. "Where ... the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *United States v. Lee*, 943 F.2d 366, 368 (4th Cir.1991).

It is appropriate to grant summary judgment based upon a defense of qualified immunity. *See Johnson v. Fankell*, 520 U.S. 911, 915, 117 S.Ct. 1800, 1803, 138 L.Ed.2d 108 (1997); *Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991); *Torchinsky v. Siwinski*, 942 F.2d 257, 260 (4th Cir.1991). The purposes of the qualified immunity doctrine are to spare a defendant the costs of litigation and to clarify the legal standards for official conduct, benefitting both the officers and the public at large. *See Layne v. Wilson*, 526 U.S. 603, 119 S.Ct.

---

**66.** The cash registers were returned between one and two weeks after the raid. (E.H. Tr.,

Vol. III at 682.)

1692, 1697, 143 L.Ed.2d 818 (1999). In light of these rationales, the defense of qualified immunity should be resolved at the earliest possible stage of litigation. *See Hunter v. Bryant,* 502 U.S. 224, 227–28, 112 S.Ct. 534, 536–37, 116 L.Ed.2d 589 (1991); *Torchinsky,* 942 F.2d at 260.

## B. Motions for Summary Judgment

The two Motions for Summary Judgment, although brought separately by the IRS Defendants and the ABC Defendants, both raise the issue of qualified immunity. The claims against the federal Defendants are brought pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), which allows a plaintiff to seek monetary damages from federal governmental officials who have violated his constitutional rights. The claims against the state officials are brought pursuant to 42 U.S.C. § 1983. "Although this case involves suits under both § 1983 and *Bivens,* the qualified immunity analysis is identical under either cause of action." *Layne,* 119 S.Ct. at 1696. Accordingly, the Court will consider the motions simultaneously.

Two claims remain against Defendants. In Count I, Plaintiffs claim that the affidavit submitted to Magistrate Judge Miller contained misrepresentations and omitted salient facts. Plaintiffs maintain that Defendants should have investigated Shofner's credibility and assertions before seeking a search warrant based upon the information she provided. Plaintiffs also allege that Defendants unnecessarily rushed the process of obtaining the search warrants. In Count II, Plaintiffs claim that Defendants are liable for taking Plaintiff Colaprete's gold watch and depriving him of the companionship of his dogs. Because each of the defendants were involved to different and varying degrees, the Court will consider the constitutionality of each Defendants' actions separately. Similarly, because each of the plaintiffs were affected by Defendants' actions to varying degrees, the Court must also consider whether each particular Defendant is pos-

sibly liable to each particular Plaintiff. With this in mind, the Court is of the opinion that because Plaintiff Bonk's home was not searched, the only constitutional violation he may have suffered he suffered vicariously as a principal of Mom's through the searches conducted at the two Jewish Mother locations. Accordingly, he cannot recover individually and summary judgment is granted with respect to all claims brought by Bonk. The Court does believe that a jury could easily find that the combined actions of Defendants violated several of the remaining plaintiffs' constitutional rights. That, however, is not at issue. A jury could also easily find that the ABC and the IRS, as agencies, were negligent and in several respects grossly negligent in procuring the search warrants. However, that too is not at issue, as Plaintiffs' have already been shown to have failed in complying with the procedural requirements of the Federal Tort Claims Act. What is at issue is whether based on the evidence presented a jury could reasonably find that any particular Defendant knew or reasonably should have known that in committing certain acts he or she was violating the constitutional rights of any particular Plaintiff. With that in mind, the Court will now examine each Defendants' role as it relates to the misrepresentations and omissions contained in the search warrant affidavit.

### 1. Misrepresentations and Omissions in Search Warrant Affidavit

Defendants argue that they are entitled to qualified immunity in this case for their procurement of the search warrants. The doctrine of qualified immunity protects governmental officials in the performance of certain discretionary functions. *See Layne,* 119 S.Ct. at 1696; *Taylor v. Farmer,* 13 F.3d 117, 120 (4th Cir. 1993). Qualified immunity shields officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Layne,* 119 S.Ct. at 1696 (quot-

ing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). *See also Taylor,* 13 F.3d at 120. Qualified immunity allows for mistakes in judgment by protecting "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant,* 502 U.S. 224, 227–28, 112 S.Ct. 534, 536–37, 116 L.Ed.2d 589 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986)).

■ There are three steps in an analysis of a claim for qualified immunity. The Court must (1) identify the specific right allegedly violated; (2) determine whether, at the time of the alleged violation, the right was clearly established; and, if so, (3) determine whether a reasonable person in the officer's position would have known that doing what he did would violate that right. *See Simmons v. Poe,* 47 F.3d 1370, 1385 (4th Cir.1995); *see also Layne,* 119 S.Ct. at 1697.

### a. *Identification of the right violated*

The first step of the qualified immunity analysis requires the identification of the specific right allegedly violated. In identifying the right,

> the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Layne,* 119 S.Ct. at 1699 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Id.* The focus of the inquiry must be upon the application of the constitutional right "to the specific conduct being challenged." *Simmons v. Poe,* 47 F.3d 1370, 1385 (4th Cir.1995) (quoting *Pritchett v. Alford,* 973 F.2d 307, 312 (4th Cir.1992)). In this case, the right asserted must be more specific than a general violation of the Fourth Amendment. An appropriate statement of the right in this case is whether the Fourth Amendment is violated when an officer intentionally or recklessly makes or causes to be made knowing omissions and misrepresentations in an affidavit supporting an application for a search warrant and thereby causes a search warrant to issue without probable cause.

The Supreme Court in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), held that where an affidavit presented in support of a search warrant contains false statements or material omissions, the resulting search warrant may be voided if the affidavit's remaining content is insufficient to support a finding of probable cause. *Id.* at 155–56, 98 S.Ct. at 2676. *See also United States v. Fawole,* 785 F.2d 1141, 1145 (4th Cir.1986). The Court reasoned that the affiant's good faith is a necessary requirement for the protections of the Warrant Clause of the Fourth Amendment to be enforced. *Franks,* 438 U.S. at 164, 98 S.Ct. at 2681. To hold otherwise would encourage an officer to mislead a magistrate who must evaluate whether probable cause existed for the issuance of a particular warrant. *See Simmons,* 47 F.3d at 1384.

■ According to the Court in *Franks,* a proper warrant affidavit must set out the particular facts,

> so as to allow the magistrate to make an independent evaluation of the matter. If an informant's tip is the source of the information, the affidavit must recite some of the underlying circumstances from which the informant concluded that relevant information might be discovered, and some of the underlying circumstances from which the officer concluded that the informant ... was credible or his information reliable.

*Franks,* 438 U.S. at 165, 98 S.Ct. at 2681 (internal citations omitted). For an omission to raise a constitutional concern, it

must be the "product of a deliberate falsehood" or made with "reckless disregard for the truth." *Simmons*, 47 F.3d at 1384 (quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir.1990)). A simple misrepresentation in an affidavit supporting a search warrant will not taint the entire warrant if the remaining information in the affidavit would support a finding of probable cause. *See Simmons*, 47 F.3d at 1378. Thus, unless the tainted information or omission is "necessary to the finding of probable cause," it will not state a constitutional violation. *Simmons*, 47 F.3d at 1384 (quoting *Colkley*, 899 F.2d at 301).

■ Therefore, the question is whether the misrepresentations that Willman had "analyzed" the records provided by Shofner, when she in fact had not, and the omissions regarding the fact that Shofner had been accused of embezzlement and fired from Mom's changed the character of the affidavit such that the affidavit would not support a finding of probable cause. The fact that Willman did not believe that drugs would be found on the premises to be searched is not sufficient to hold her responsible for U.S. Attorney Everhart's addition of drugs as an item to be searched for on the warrants. Willman did not actually ask for that warrant, Everhart did. Accordingly, the Court must examine how the affidavit would have looked without the misrepresentations and omissions generated by Willman.

Aside from the misrepresentations and omissions, the only evidence supporting the affidavit was ABC agent Kelley's inadequate analysis of the cash register tapes and handwritten daily sheets provided by Shofner, Dunford's claims that the MBARs showed significant under-reporting, and

Shofner's allegations, some of which were corroborated and some of which were not.

Considering first Kelley's review of the cash register tapes and handwritten daily sheets, analysis, it is clear that this was not a true analysis at all, and that instead it was a mere reconciliation of two sets of unauthenticated documents—cash register tapes and handwritten daily sheets, both provided by Shofner. Indeed, the only source of information that two sets of books were kept, that money was being skimmed and laundered, and that drugs were being sold was Shofner. This fact, when coupled with the knowledge that Shofner was a convicted felon, had been fired from Mom's, and had been accused of embezzlement, makes the veracity of the records she provided extremely questionable and renders any analysis of such handwritten documents of limited utility in supporting a finding of probable cause. Rather than supporting probable cause, a true analysis of the documents provided by Shofner actually demonstrates that Shofner's allegation of skimming was not realistic. The cash register tapes did not vary significantly from the amounts The Jewish Mother reported on its MBARs and tax returns at that time.[67] It was only when Kelley added in extraneous amounts for "cover charges" and "system shut-off" provided by Shofner that her analysis began to show under-reporting. According to the materials provided by Shofner, Kelley's analysis showed that The Jewish Mother had taken in more than $25,000 in cover charges for the fifteen-day period Kelley analyzed. On July 9, 1999, the Court ordered Defendants to provide "the cash register receipts pro-

---

67. Shofner provided cash register tapes for 15 days in November that reflected daily gross receipts ranging from $3,000 to $10,000. The mean average daily intake for this 15-day period as shown by the GRP total on the cash register tapes was $5,718.97. Extrapolating this figure over a 360 day period, which allows for closings due to holidays and weather, The Jewish Mother's annual receipts would have been $2,058,828.43. While this analysis is admittedly very rough, this figure is very close to the gross receipts Mom's reported on its 1992 tax return—$2,010,959—and the gross sales figure Mom's reported on its 1992 MBAR—$2,154,496.18. Therefore, based only on the cash register tapes, it is not possible that a restaurant like The Jewish Mother with gross receipts of just over two million dollars a year could be involved in skimming the amounts described by Shofner of two million one year and at least one million every other year.

duced by Deborah Shofner prior to obtaining the search warrants on April 1, 1994." Defendants did not produce any handwritten records for the period November 9 through November 23, but did produce handwritten records for December 14, 1993 through December 31, 1993 in answer to the Order. The jury could conclude that the records produced by Deborah Shofner prior to April 1, 1994 were those filed in answer to the Court's Order. On the records dated December 14, 1993 through December 31, 1993, there were no designations for "system shut-off" nor were any significant "cover charges" shown. No analysis was done of the December 14, 1993 through December 31, 1993 records. A jury could conclude that this would have disproved Kelley's analysis.

Any reasonable officer with a basic understanding of the restaurant business at the Virginia Beach oceanfront and knowledge of the typical cover charges at the restaurant could find the $25,000 cover charge figure incredible and inherently unbelievable. Similarly, a jury could conclude that a reasonable officer would find it incredible and unbelievable that a restaurant like The Jewish Mother could skim more than $150,000 a month, as Kelley's analysis showed, and still report nearly two million dollars in sales each year as The Jewish Mother did during the relevant time period. A jury could conclude that the documents provided by Shofner and Kelley's analysis of those documents do not support a finding of probable cause, and in fact, actually discredit Shofner as a witness.

The second piece of evidence upon which probable cause might be based is the MBARs that were provided by Mom's to the ABC. However, a jury could conclude that the MBARs also do not support a finding of probable cause. According to Dunford, the MBARs allegedly showed that the Virginia Beach Jewish Mother was substantially under-reporting its sales. However, Dunford's analysis, which examined the wine and beer figures, was based only upon the cost of beer at the restaurant and did not include the cost of wine, and was not based on averages but was based only on the supposed retail price of beer. While irregularities do in fact appear on the face of the MBARs, they do not support Dunford's claim that The Jewish Mother was under-reporting $500,000 a year in sales, much less Shofner's claim that they were under-reporting one to two million each year in sales. Moreover, Dunford's claims of under-reporting are rebutted by the fact that the ABC computer program used to analyze MBARs apparently did not identify The Jewish Mother's MBAR as one of the eight worst in the Tidewater area in July 1993 or as one of the eight worst in the Tidewater area September 1993 because The Jewish Mother's MBAR was not among those sent by the ABC to the IRS pursuant to the information sharing program. A jury could conclude that the 1990 and 1991 MBARs, filed in 1991 and 1992 respectively, were sent to the IRS because the IRS specifically asked for them, not because of an analysis conducted by Dunford. Based upon Kelley and Dunford's financial analyses, it would not be unreasonable for a jury to conclude that Defendants did not verify Shofner's allegations, but instead, prepared the analyses merely to justify a search by inflating numbers to make it appear that millions of dollars were being unreported. These so-called analyses do not support a finding of probable cause.

Ignoring Kelley and Dunford's analyses, the question then becomes whether the uncorroborated and apparently questionable testimony of a first-time informant, whose credibility and veracity was unknown, but who was the "comptroller" of the business accused of financial crimes and who made statements that could possibly have been, but were unlikely to be against her penal interest, was sufficient to support a finding of probable cause.

" 'Probable cause,' for Fourth Amendment purposes, means 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person,

or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.' " *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir.1992) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979)). "[P]robable cause means only that a probability, and not a prima facie showing, of criminal activity need be established." *United States v. Hodges*, 705 F.2d 106, 108 (4th Cir.1983). The Supreme Court has instructed that a court must look at the "totality of the circumstances" when evaluating whether an informant's tip provides probable cause to seek a warrant. *Illinois v. Gates*, 462 U.S. 213, 230–31, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). A court should consider the informant's veracity, reliability and basis of knowledge in evaluating the tip. *Id.* at 230, 103 S.Ct. 2317, 2328.

Considering the totality of the circumstances, Defendants had many reasons to doubt Shofner's veracity. Shofner's termination from The Jewish Mother, under questionable circumstances, raises the concern that she may have had a motive to fabricate allegations against Plaintiffs, either to retaliate against her former employer or to protect her own interests. Moreover, Defendants knew that Shofner was a convicted felon, and that she had been accused of embezzlement by Mom's owners. It appears that Defendants did not believe that Shofner was actually being investigated by the Virginia Beach Police for embezzlement when in fact she was. Shofner not only failed to provide any tangible evidence to support her allegations, but actually presented evidence (cash register tapes which showed no skimming and daily sheets from December 1993 which had no figures concerning "cover charges" or "system shut-off") that cast doubt upon her assertions. Furthermore, Shofner's allegations about the quantity of drugs at the Virginia Beach Jewish Mother were so extraordinary that they could not possibly have been believed by reasonable law enforcement officers, and in fact, were not believed by almost all who were associated with the investigation. Scheiner, O'Brian, McDougal, and Willman all expressed doubts about Shofner's drug account. Surely, a witness who could make up stories about one hundred kilos of cocaine, worth several million, could easily fabricate a story about a double set of financial records. Moreover, since Shofner was a first-time informant, Willman had no independent basis for believing her. Indeed, Scheiner indicated that Shofner's information required confirmation. Lastly, it is virtually impossible to skim and launder money at the same restaurant at the same time, as Shofner claimed was occurring at The Jewish Mother.

On the other hand, Shofner was the former "comptroller" of The Jewish Mother and would have an obvious foundation for the statements she made about the financial practices of The Jewish Mother. Moreover, the ABC agents were able to corroborate some aspects of Shofner's story, namely, that The Jewish Mother had been selling liquor at the Colley Avenue location without a license. Furthermore, Willman's NADDIS check revealed that Miller had been convicted of a drug charge in the 1980s, and that Colaprete had, according to some unidentified informer, been in Jamaica in the 1970s to oversee a drug shipment. While the amount of drugs Shofner reported was clearly outlandish, both of these instances reported in NADDIS made Shofner's claim that there were at least some drugs at The Jewish Mother less suspect. Bennis and Altman also verified that Shofner could indeed forge Berger's signature as she claimed she had done on the management agreement. Her ability to replicate the signature also gave credibility to her account.

Some of the defendants have also indicated that they believed Shofner because she provided information that was against her penal interest. Shofner's willingness to implicate herself in this possible criminal activity, if true, is of significance in determining probable cause. "The Supreme Court has noted that an informant's statement has an indicia of reliability when

it is self-incriminating." *United States v. Patterson,* 150 F.3d 382, 386 (4th Cir.1998) (citing *United States v. Harris,* 403 U.S. 573, 583, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971)). Defendants argue that under *United States v. Harris,* the fact Shofner made statements against her penal interest provided probable cause *per se.* The Court does not read *Harris* this way. In the *Patterson* case, in considering whether an accomplice's statements provided probable cause to search the defendant's automobile, the Fourth Circuit noted that "*unless it is incredible or contradicts known facts to such an extent [that] no reasonable officer would believe it,* a co-defendant's confession that he and the suspect committed the crime ... and used certain instrumentalities, supplies probable cause for arrest and seizure." *Patterson,* 150 F.3d at 386 (emphasis added; citation omitted; alteration in original). Thus, while declarations against interest strongly support a determination of probable cause, such declarations must still be viewed in the totality of the circumstances.

However, it is the opinion of the Court that Defendants' reliance on Shofner's statements against her penal interests as a justification for believing Shofner's story was an after-the-fact rationalization to bolster Shofner's credibility. First, Shofner never implicated herself in any of the drug allegations she made. Second, according to both Santana and Bennis, the so-called ABC violations Shofner implicated herself in, including the alleged forging of Berger's signature, would have resulted at most in an administrative offense and nothing more. In fact, the only hearing ever conducted in this case was an administrative hearing resulting only in a fine of $2,500. Furthermore, the so-called double set of books or federal income tax fraud alleged by Shofner could not possibly have implicated Shofner. The tax returns for the years through calendar year 1992 were filed before Shofner came to work for Mom's in September or October 1993. Moreover, the 1993 tax return was not yet

due and had not yet been filed when Shofner made her allegations to the ABC and IRS. In fact, Shofner never prepared and filed a tax return on behalf of The Jewish Mother, or even participated in the preparation and filing of a tax return. Even if Shofner had been involved in filing those returns, as mentioned above, the documents provided by Shofner demonstrated that it was unlikely that The Jewish Mother was hiding millions of dollars in income as Shofner claimed. The failure of Mom's to pay state sales taxes on the Colley Avenue location for part of December 1993, January 1994, and February 1994 also could not have involved a criminal violation if the taxes were not due until the end of February. It would be some time before such action could even be considered willful and criminal. Besides, Mom's failure to pay sales tax for two and a half months was not significant compared to the thirteen months that Berger and Lineberry had failed to pay taxes for the location without penalty from the ABC.

Based on the totality of the circumstances, the Court is of the opinion that Shofner's testimony alone would not have been sufficient evidence to support a finding of probable cause. While some of her statements were corroborated and Shofner indeed made statements that could have been stretched into being self-incriminating if true, those factors are greatly outweighed by the factors militating against a finding of credibility. Consequently, the misrepresentations and omissions were necessary to the finding of probable cause and Plaintiffs have stated a constitutional violation.

Defendants rely upon *Bernstein v. United States,* 990 F.Supp. 428 (D.S.C.1997), for the proposition that "an allegation that the investigators 'knew or should have known' some fact cannot support a *Bivens* claim." *Id.* at 438. However, that court was faced with the allegation that the IRS failed to adequately investigate the case and to pursue potentially exculpatory evidence before seeking a warrant.[68] *Id.* In-

---

**68.** The *Bernstein* case is also factually distinct

from this one. In *Bernstein,* the IRS initiated·

deed, that is one of Plaintiffs' claims, but it is not the claim that states a constitutional violation. The constitutional claim in this case is that Defendants made knowing false statements and deliberate omissions in the affidavit provided in support of the application for the search warrants. Defendants had all of the facts at hand at the time the affidavit was drafted; no additional investigation was necessary with regard to the omissions that were made. Willman simply did not analyze the information in her possession at the time of the affidavit. Kelley and Dunford completely ignored the December information given to them by Shofner. Defendants acted impulsively, without hesitating to corroborate Shofner's statements, yet falsely represented in the affidavit that such corroboration had occurred. *See Torchinsky*, 942 F.2d at 263 (warning that impulsive or reckless reliance on a witness in applying for a warrant may not be protected by qualified immunity). Clearly, Defendants' actions were in contravention of Plaintiffs' constitutional rights.

### b. *Was the right violated "clearly established?"*

■ Next, the Court must determine whether the right was "clearly established" at the time of the application for the warrant. In doing so, the Court must evaluate the " 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Layne*, 119 S.Ct. at 1699 (quoting *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). There is no dispute in this case that the *Franks* case was good law and enforced in the Fourth Circuit at the time of these search warrants. *See Fawole*, 785 F.2d at 1145. Aside from common sense dictating that an affidavit under oath should contain comprehensive and truthful statements, the *Franks* case clearly established that false statements or material omissions in an affidavit supporting an application for a search warrant could constitute a violation of the Fourth Amendment if the remaining content was insufficient to support a finding of probable cause. Moreover, the law regarding search and seizure is well-established and nearly every law enforcement officer in the country has received extensive instruction and training regarding the Fourth Amendment. *Taylor*, 13 F.3d at 120. This is not a situation where Defendants could claim that the right is unfamiliar or is based on an obscure area of the law.

### c. *Reasonable officer standard*

Finally, the Court must assess whether a reasonable person in the officer's position would have known that doing what he or she did was unconstitutional, that is, would a reasonable officer in the Defendants' respective positions in this case know that his or her acts would lead to false statements and material omissions in the search warrant affidavit which was otherwise insufficient to support probable cause. This is an objective test and is not dependent upon what the Defendants actually believed. "Even law enforcement

an investigation of the defendants after their accountant contacted the IRS. Aside from that fact, the cases are dissimilar. The accountant in *Bernstein* provided the IRS not only copies of the false income tax returns, but the correct tax returns that were rejected by the defendants. *Bernstein*, 990 F.Supp. at 431. The IRS agent reviewed the documents and verified that the false returns had been filed. *Id.* Then, over the next five months, the accountant taped conversations with the defendants, at the request of the IRS. *Id.* at 431–32. In several of those conversations, the defendants admitted to filing false tax returns. *Id.* Consequently, the defendants' demands

that the IRS should have done additional investigation fell on deaf ears.

The facts in the present case are much different. Plaintiffs' accountant did speak with the IRS, but did not provide any verified records that were reviewed by the IRS. Despite the absence of any independent analysis, Defendants falsely represented in the affidavit that such analysis had been conducted. Moreover, the entire time that elapsed between the time Shofner first spoke to the IRS and the time the warrants were executed was forty-eight hours, not six months as in *Bernstein*.

officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter*, 502 U.S. at 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (quoting *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3040). The reasonableness of Defendant's conduct "does not turn on whether probable cause was, in fact, present." *Smith v. Reddy*, 101 F.3d 351, 356 (4th Cir.1996). In assessing the situation, the Court must be cautious not to second guess the officer's decisions with the benefit of hindsight, but must evaluate the circumstances based upon the information each officer had available at the time of his or her action. *Taylor*, 13 F.3d at 120. However, when evaluating an officer's actions in the context of a question of qualified immunity, "[i]f there are genuine issues of historical fact respecting the officer's conduct or its reasonableness under the circumstances, summary judgment is not appropriate, and the issue must be reserved for trial." *Pritchett*, 973 F.2d at 313.

With this in mind, the Court must analyze the actions taken by each Defendant to see if a reasonable officer in each Defendant's position would have known that his or her actions were unconstitutional.

### (1) IRS Defendants

*Willman*

■ As the affiant, IRS defendant Willman is the individual ultimately responsible for what was and was not included in the affidavit. In the search warrant affidavit, Willman outlined her expertise in analyzing business records to ascertain if financial crimes have been committed. (Search Warrant Aff. at 1–2.) However, Willman's actual experience is not accurately described in the affidavit. In her description of her qualifications, Willman stated that she was experienced in cases involving restaurants. (*Id.* at 2, 4, 5.) In fact, she had only participated in one investigation involving a restaurant, and

even then she gave only a limited amount of assistance. (E.H. Tr., Vol. III at 679.) Furthermore, all of her prior cases involved investigating individuals, and this was her first criminal investigation of a business. (Willman Dep. at 89–90.) Moreover, Willman could not recall one investigation she had worked on which involved money laundering or skimming. In fact, during the time between graduating from college and drafting this affidavit, Willman had not had any training with regard to accounting or auditing. Instead of relying on her own skills, at the time she was drafting the affidavit Willman typically relied upon the assistance of revenue agents to deal with such matters in her investigations.[69] (Willman Dep. at 12.)

Willman not only asserted that she was an expert in the determination of whether a restaurant had committed financial crimes, but she also led the magistrate to conclude that she had analyzed records herself that she in fact had not. For example, on page eight of the search warrant affidavit, Willman stated:

> DS [Shofner] provided to the affiant records she had in her possession that confirms her allegations. These records were analyzed by the affiant and an accountant with ABC's Financial Investigations Section. These records revealed large sums of "skimmed" receipts and a pattern of money laundering.

(Search Warrant Aff. at 8.) However, Willman did not personally analyze any records before submitting the affidavit. Instead, she relied upon the analysis of ABC agent Valerie Kelley in drafting the affidavit. Furthermore, it is doubtful that Willman even carefully reviewed Kelley's analysis to ensure that it was proper and thorough. Kelley's analysis concluded that for a fifteen-day period in November 1993, the Jewish Mother brought in more than $25,000 in cover charges and under-reported $77,000 in income. No reasonable

---

69. In this case, Willman relied upon the expertise of revenue agent, Joanne Haarstick. (Willman Dep. at 13.) However, Willman did not contact Haarstick until a month after the raids occurred. (*Id.* at 40.)

agent with Willman's supposed qualifications could believe this to be true. In fact, the analysis of the cash register tapes should have demonstrated the impossibility of Shofner's allegations that The Jewish Mother skimmed more than a million dollars a year for several years and that in one year, skimmed nearly two million dollars. (Search Warrant Aff. at 10.) Without adding in the extremely high cover charge and "system shut-off" figures provided by Shofner, the cash register tapes revealed earnings that over a 360–day period would be remarkably consistent with The Jewish Mother's tax return and MBAR filings for gross revenue from the relevant time period. Specifically, the cash register tapes for the fifteen-day period in November 1993 reflected gross receipts ranging from $3,000 to $10,000 a day. The mean average daily intake for the fifteen-day period was $5,718.97. Extrapolating that over 360–day period would result in annual receipts of approximately $2,058,828.43.[70] It is highly unlikely that a restaurant with gross receipts of just over two million dollars a year could be skimming a million dollars a year, as alleged by Shofner, much less skimming two million dollars a year. Indeed, if Willman had analyzed the handwritten records as she stated she had in her affidavit, she would have realized that the cash register receipts and handwritten documents provided by Shofner did not support her allegations, but instead cast doubt on the credibility of Shofner's story. The December handwritten records had no "system shut-off" figures or excessive "cover charges." A jury could find that the December records were ignored.

An expert in the analysis of the financial records of restaurants, as Willman represented herself to be in the affidavit, would have realized that Shofner's allegations were extraordinary. According to the MBARs, throughout the relevant time period the Virginia Beach Jewish Mother had 189 to 216 seats. Furthermore, according to Detective Bennis, who the ABC relied on for pricing information at the Virginia Beach Jewish Mother, the typical cover charge to enter the restaurant on nights when there was live entertainment typically ranged between two and three dollars, and reached ten dollars only when a nationally-known band appeared. Assuming that each individual spends twenty-seven dollars on food and drink,[71] for a total of thirty dollars when combined with a three dollar cover charge, The Jewish Mother could expect to earn $6,480 a day when 216 seats were all filled. If that amount is earned every day of the year, which is an absurdity, the restaurant would realize gross receipts of $2,365,200. Obviously, this analysis is rough and fails to take into consideration the turning of tables, nights when there was no cover charge, and restaurant closings due to holidays and bad weather, especially in the Virginia Beach resort area. However, even considering the vagaries of this analysis, it still is not substantially different from the cash register tapes provided by Shofner, and the gross revenues of $2,098,083 reported on the 1993 tax return by The Jewish Mother or the $2,010,959 shown on the 1992 tax return. Again, any person having any familiarity with restaurants and knowledge of the size and average prices of The Jewish Mother restaurant would question whether a restaurant the size of The Jewish Mother in Virginia Beach could possibly have been skimming the amounts represented by Shofner. The

70. This analysis is obviously cursory and does not consider variables such as the resort nature of the community in which The Jewish Mother operates, nor the fact that revenues for taverns are higher on the weekends. However, the result obtained from this analysis is remarkably similar to the reported gross receipts of The Jewish Mother in 1992, which was $2,010,959.

71. This is a high estimate. According to Bennis, who the agents relied on for information about the price of beer at the Virginia Beach Jewish Mother, a sandwich and a couple of beers typically cost ten to twelve dollars.

Court is suggesting that if an analysis of the cash register tapes or the size of the restaurant was done as Willman indicated, that analysis would rebut the very conclusion which Willman falsely indicated to the magistrate. Indeed, it appears that there were no records that corroborated Shofner's allegations of skimming aside from undocumented, unsupported figures referred to as "system shut off" and "cover charges," which have not been supplied to the Court. For example, there were no wire transfers, no bank deposits, and no large amounts of cash hoard being referenced. Thus, Willman misrepresented that she, using her training and expertise, had analyzed the records.

Willman created the perception that the conclusions she reached in the affidavit were based upon her expertise in analyzing business records to determine whether tax laws had been violated. Throughout the affidavit, she refers to her "training and experience" as the basis for her conclusion that there was probable cause that revenue laws had been broken. (Search Warrant Aff. at 2, 3, 4, 8, 18, 19, 22.) But in fact, Willman did not rely on her own expertise, but instead on the representations of Shofner and the expertise of the ABC agents. The problem lies in the fact that Willman did not make this known to the magistrate. Instead of outlining the expertise of Kelley and Dunford, Willman falsely described her own expertise for two pages in the affidavit. It would not have been unreasonable for Willman to rely on the expertise of others to reach a conclusion, but it was unreasonable for her to fail to disclose to the magistrate that she relied exclusively on the assertions of the ABC agents and the uncorroborated statements of Shofner, and it certainly was unreasonable for her to mislead the magistrate into believing that she had utilized her own expertise in analyzing the business records.

Finally, it was unreasonable for Willman to fail to clearly disclose in the affidavit that Shofner had been accused of embezzlement and terminated from The Jewish Mother for those charges. Defendants ar-

gue that the charges were contained in the search warrant affidavit. On page seven of the affidavit, Willman stated:

On March 28, 1994 Mr. D.B. Gray, CPA telephoned ABC Special Agent W.D. Altman that he had recently been retained to complete the Mixed Beverage Annual Review (MBAR) report for MOM'S INC. T/A/ The Jewish Mother located in Virginia Beach. He further advised that the owners had received a written warning from ABC regarding the MBAR being late and he needed an extension because the bookkeeper had not filed the report as required. He said the owners suspected some type of embezzlement and implicated the previous bookkeeper. Mr. Gray faxed a letter restating the conversation with Agent Santana and advised him of this information. Agent Santana on March 29, 1994 went to the home of Deborah Shofner (DS) the former bookkeeper and CFO of MOM'S, INC. to interview her regarding her involvement with MOM'S, INC.

(Search Warrant Aff. at 7.) Defendants argue that this statement clearly indicated that Shofner was the former bookkeeper that had been accused of embezzlement. However, considering the totality of the affidavit, the statement is ambiguous at best. It is not clear that from this statement that Shofner was the suspected embezzler because the statement could have been referring to another bookkeeper at The Jewish Mother. Shofner represented to Willman that The Jewish Mother employed two other bookkeepers, David Giesen and Veronica Haight. (Search Warrant Aff. at 9.) Additionally, this is the only place in the 22–page affidavit that Shofner is not referred to by name, the initials "DS", or by the term, "witness." A magistrate would have been misled by this inconsistency, and a jury should pass on whether this was done by design or through inadvertence.

Moreover, Willman failed to include this critical piece of information in the logical

section of the affidavit—the section titled "Credibility of Witness." In that section, Willman described Shofner's prior criminal record and the impact that her involvement in potentially criminal activity at The Jewish Mother would have on her parole status. However, Willman never stated that Shofner had been fired for allegedly embezzling from Plaintiffs. Such information would have allowed the magistrate to evaluate whether Shofner might be a disgruntled employee attempting to retaliate against her former employer or whether Shofner was attempting to blame others for her fraudulent activities. A reasonable officer knows that a magistrate must make an independent assessment of the situation based only upon the facts presented in the affidavit. Defendants should not be allowed to selectively consider the facts. "A police officer may not close her or his eyes to facts that would help clarify the circumstances." *Taylor*, 13 F.3d at 120.

Another critical piece of information, known to Willman, but omitted from the affidavit dealt with Shofner's criminal history. In the affidavit, Willman declared that Shofner had been convicted of credit card fraud in Florida. After attempting to verify this information with the NCIC, Willman learned that Shofner had been convicted of uttering a false check in Florida and a separate federal charge for credit card fraud for which she was under federal supervision at the time of the interviews.[72] Shofner had not disclosed both convictions to Willman. (Willman Dep. at 119.) Willman did not inform the magistrate about both convictions, or the fact that Shofner had failed to disclose them both to her.[73] (*Id.*)

Obviously, Willman was aware that some individuals associated with the investiga-tion had doubts about Shofner's credibility, at least as to her allegations regarding the presence of cocaine at The Jewish Mother. Shofner stated that she had seen cocaine stacked in a pile the size of a "cord" of wood, i.e., eight feet long, four feet wide, and four feet high, at The Jewish Mother's Virginia Beach location. Scheiner and McDougal both expressed doubts about the accuracy of this allegation. Apparently, Willman may also have doubted Shofner's drug allegations, because although drugs were listed as an item to be searched for in the affidavit, the request to search for drugs was not added to the search warrants until Everhart reviewed the affidavit and suggested that it be added. Willman should have disclosed her doubts about the drug allegations to the magistrate.

The fact that Willman sought the advice of IRS attorney McDougal and U.S. Attorney Everhart does not make her misrepresentations and omissions in her affidavit reasonable. There is no evidence in the record that either attorney knew that Willman had not personally analyzed the records of The Jewish Mother as she represented in the affidavit.[74] Cursory legal review cannot cure the factual inaccuracies and omissions in the affidavit.

Based on these facts, a jury could conclude that Willman knew or reasonably should have known that she was making material misrepresentations and omissions in the affidavit, and that she did so in an effort to give credibility to the affidavit and increase the likelihood of obtaining a search warrant. Furthermore, the fact that Willman and the other IRS agents were scheduled to participate in a training seminar on the Easter Monday following

---

**72.** These charges are not those shown in the records of this Court but represent what was disclosed to Willman prior to the affidavit being presented to the magistrate.

**73.** This Court's records indicate Shofner had been convicted uttering worthless checks in 1982, grand theft in 1989, and a federal offense of use of an unauthorized access device in 1992,

**74.** McDougal, one of the attorneys who reviewed the affidavit, stated that he "thought that Ms. Shofner's statement about the quantity of drugs she claimed she saw at The Jewish Mother sounded implausible; however, I thought those allegations should remain in the affidavit so that the Magistrate Judge could draw his own conclusions about Ms. Shofner's credibility." (McDougal Decl. ¶ 8.)

the raids suggests that time was of the essence in procuring and executing the warrants before Easter Sunday. The rush to obtain the warrants may have led Willman in haste to misrepresent to the magistrate her credentials, and misrepresent that a thorough investigation had been conducted, when in fact only a cursory review had taken place. A reasonable officer would know that these misrepresentations and omissions, when viewed in light of Willman's repeated references in the affidavit to her experience and expertise in the area of financial investigations, gave the information she provided an aura of reliability it would not otherwise have possessed, and thus, made it likely that a warrant would issue without probable cause. Accordingly, Willman's motion for summary judgment must be denied with respect to Plaintiffs' claims concerning the misrepresentations and omissions in the search warrant affidavit.

*Kast*

█ Next, the Court will consider the involvement of Kast, Willman's supervisor. In a *Bivens* action, a supervisor can only be held liable for the acts of a subordinate "by proof of direct culpability in causing the injury either by directly authorizing it or by expressly or tacitly condoning by inaction a known pattern of comparable coworker conduct." *McWilliams v. Fairfax County Bd. of Supervisors*, 72 F.3d 1191, 1197 (4th Cir.1996); *see also White v. Downs*, 112 F.3d 512, 1997 WL 210858, *4 (4th Cir.1997), *cert denied*, 522 U.S. 866, 118 S.Ct. 175, 139 L.Ed.2d 116 (1997).

█ There is evidence in the record that Kast authorized the affidavit that was submitted to Magistrate Judge Miller. (Willman Dep. at 17, 31.) Although it does not appear that Kast physically helped draft the affidavit, she was involved in the preparation of the affidavit. (Kast Dep. at 16.) Certainly as Willman's supervisor, Kast should have been aware of Willman's qualifications. Therefore, a reasonable person in Kast's position would have known that Willman misrepresented her credentials to the magistrate. Furthermore, Kast was aware that Shofner had been accused of embezzlement by Mom's principals. (E.H. Tr., Vol. III at 629.) A reasonable officer in Kast's position would have made sure that this fact was clearly portrayed in the affidavit. Kast's supervision of Willman in the drafting of the affidavit could easily be found by a jury to have been grossly negligent. Nevertheless, the fact remains that there is no evidence tending to show that Kast knew Willman had not conducted a thorough analysis of the financial records provided by Shofner or that Willman had not corroborated other information provided by Shofner. Kast did not review any of the financial information Willman supposedly analyzed or any other information Willman claimed to be corroborating. Thus, there was no reason for Kast to doubt the conclusions Willman drew in the affidavit with regard to the alleged criminal activity. A reasonable officer in Kast's position would believe that Willman had indeed corroborated the information she claimed to have corroborated, and therefore, would be reasonable in believing that The Jewish Mother was engaged in substantial under-reporting. Thus, an officer in Kast's position could reasonably think that the affidavit in support of the search warrant was supported by probable cause, even if she knew that the affidavit misrepresented Willman's credentials and omitted relevant information about Shofner's credibility. Accordingly, Plaintiffs have not raised a material issue with regard to the constitutionality of Kast's behavior and summary judgment is granted on the basis of immunity with regard to all claims against her stemming from the misrepresentations and omissions in the search warrant.

**(2) ABC Defendants**

The ABC Defendants initiated the investigation of The Jewish Mother. Unquestionably, there were violations of the ABC regulations by The Jewish Mother. It is obvious that the Norfolk Jewish Mother, which opened in December 1993, was oper-

ating without a proper alcoholic beverage license or management agreement. The ABC could have entered both the Virginia Beach and Norfolk restaurants at any time and seized business records, or indeed, pulled the Norfolk ABC license. Instead, it appears the ABC agents may have purposely delayed any action at the Norfolk location at the behest of Berger. Later, after Shofner appeared, the ABC defendants sought the assistance of the FBI and then the IRS to obtain search warrants for not only the two Jewish Mother restaurants, for which the ABC did not need search warrants, but also the personal residences of Miller and Colaprete. The ABC Defendants attempt to avoid liability by arguing that the IRS was responsible for drafting the affidavit and procuring the warrants. The ABC defendants would like the Court to believe that once the Norfolk Police and the FBI interviewed Shofner, they were no longer involved in the matter beyond providing support. However, at oral argument and at the evidentiary hearing, it became apparent that the ABC defendants were involved in all aspects of the searches, from the initial interview of Shofner, to the execution of the warrants, to the maintenance of the seized materials and the protection of Shofner following the raids. The facts clearly suggest that this was a joint investigation between the ABC and IRS instigated by ABC personnel, and conducted out of the offices of the ABC. The majority of the work done to procure the warrants was performed in the Richmond ABC office, not the IRS office or even in Norfolk or Virginia Beach. Moreover, in drafting the affidavit, the IRS defendants relied heavily upon the information provided by the ABC defendants to corroborate the statements made by Shofner, including Dunford's determination that there was substantial under-reporting at the Virginia Beach location. (Willman Dep. at 52.) The raids were formulated and assignments made at the ABC office in Chesapeake. Moreover, the ABC held the evidence seized, not the IRS. The evidence also shows that the ABC placed Shofner in protective custody following the raids. The ABC's involvement was apparently so great that FBI Agent O'Brian believed that it was the ABC that wanted the search warrants. In all, the presence and involvement of the ABC defendants was not only pervasive, but prominent, throughout the investigation, procural, and execution of the search warrants in this case, as well as in the protection of Shofner and storage of the seized materials. There is no question that the ABC defendants played more than just a support role. In addition, prior to the IRS' involvement, Dunford wanted to arrest the principals of The Jewish Mother. Based on these facts, a jury could find that the ABC masterminded the entire operation through Dunford, and the only reason the ABC defendants involved the IRS in this matter was to gain access to the resources and power the IRS could provide. If individual ABC defendants knowingly provided false information or omitted material facts to Willman for the purposes of obtaining search warrants, they would not be entitled to qualified immunity.

Before turning to a discussion of the individual ABC defendants, the Court notes several troubling questions about the ABC defendants' involvement in this case. First, there is evidence that Donaline had failed to pay sales tax on the Colley Avenue location since October 1992. It strikes the Court as odd that the fact that Berger and Lineberry had failed to pay taxes for over a year was of no moment to the ABC, but Mom's, which had only come into possession of the Colley Avenue location in December 1993, was scrutinized so closely for failing to pay its taxes for half of December, January, and February. The fact that the ABC's interest arose at the same time Berger was complaining to the ABC about his dealings with Mom's gives the Court cause to wonder whether the ABC was trying to help Berger and Lineberry better their deal with the Mom's principals. According to Mom's attorney Sullivan Callahan, Berger was already trying to use the threat of turning in the Colley Avenue location license to the ABC

as leverage to sweeten the deal between Donaline and Mom's. Second, according to Callahan, Santana and the ABC knew that Callahan was representing Mom's in its acquisition of the Colley Avenue location. However, never once did Santana or any ABC agent call Callahan to inquire about missing documentation. When Callahan called Santana just two days before the raids to inquire whether there were any problems, Santana told him . everything was fine. Third and finally, part of the justification for the searches in this case stems from MBARs that allegedly show that the Virginia Beach Jewish Mother was under-reporting, and the belief that the Colley Avenue location was selling alcohol without a license. Both of these violations would warrant an investigation and reprimand by the ABC. Under Virginia law, the ABC had the absolute right to enter both the Virginia Beach Jewish Mother and the Colley Avenue location without a warrant to seize any and all business records for the purposes of such investigation. However, neither of these would have been the subject of any criminal action. The question the Court must ask is if the ABC believed such violations to be occurring before Shofner made her allegations, why did it not exercise its power to seize records without a search warrant? A jury could easily find that prior to the introduction of Shofner to the ABC, the ABC had not independently concluded that The Jewish Mother was under-reporting its sales.

The ABC defendants now argue that because they could have seized records without a warrant, they cannot be held liable for the procurement of the search warrants with regard to the two restaurants. However, the raids that were conducted in this case go beyond the ABC's regulatory power to seize records. Using armed personnel to remove cash registers and financial records from the premises, and usher customers from the establishment during dining hours certainly provided not only a lot of publicity, but also showed the principals of Mom's "what for."

*Santana*

■■■ Agent Santana was responsible for initially contacting Shofner and obtaining the assistance of the Norfolk Police Department. After debriefing Shofner, Santana was responsible for informing Willman about his investigation of the Colley Avenue location. (Santana Aff. ¶ 43.) Santana was present at a meeting when FBI Agent Scheiner expressed doubts about Shofner's credibility with regard to the amount of drugs that she claimed to have seen at the Virginia Beach Jewish Mother. It appears that Santana did not inform Willman about Scheiner's concerns. Ordinarily, this failure to inform Willman, if intentional, might suffice to subject Santana to liability. However, IRS counsel John McDougal expressed the same concerns about Shofner's drug account to Willman when they discussed the case during the drafting of the affidavit. McDougal felt that Shofner's drug account should remain in the affidavit so that the magistrate could reach his own conclusion about whether it was believable. Accordingly, it cannot be said that Santana's failure to relay this information to Willman caused Willman to include the drug information in the search warrant affidavit and thereby, the warrants to issue without probable cause. Thus, Santana's omission is not sufficient to subject him to liability. Although Santana's apparent intentional failure to communicate with Callahan with regard to The Jewish Mother is troubling, it does not raise any constitutional concerns insofar as Santana is concerned. Furthermore, there appear to be no other facts which would overcome Santana's claim to immunity, therefore, summary judgment must be granted with regard to all claims against him stemming from the misrepresentations and omissions in the search warrant affidavit.

*Dunford*

Unquestionably, ABC defendant Dunford wanted to arrest the owners of The Jewish Mother. However, according to

Dunford, the higher-ups in the ABC felt that no arrests should be made. Nevertheless, the degree of Dunford's possible malice toward The Jewish Mother's owners or their attorney is not at issue. Even if Dunford possessed extreme malice toward The Jewish Mother's principals, that fact would not subject him to liability if a reasonable officer in his position would believe that he was not violating the constitutional rights of the Plaintiffs in committing the actions he committed in this case. Thus, putting Dunford's possible malice and motivation to the side, the Court must undertake to examine Dunford's conduct from an objective point of view.

■ Dunford first presented the situation and Shofner to the IRS in March 1994. (Willman Dep. at 25–26.) More importantly, Dunford briefed Willman regarding the potential criminal activity of The Jewish Mother as evidenced by the MBARs. According to Willman, Dunford explained the MBARs to her and informed her that they demonstrated that the Virginia Beach Jewish Mother was under-reporting a "substantial amount." Dunford claims that he identified the Virginia Beach Jewish Mother as an under-reporting restaurant in October 1993, and that because of this, he sent four Jewish Mother MBARs to the IRS pursuant to their information sharing program. However, a jury could conclude that IRS agent Ryan specifically requested and received only two of The Jewish Mother's MBAR from the ABC in October 1993. Moreover, the batches of MBARs from Tidewater's worst potential violators that were sent by ABC to the IRS in July and September 1993 did not include any MBARs from The Jewish Mother. A jury could easily find, that Dunford did not send the MBARs to the IRS on his own accord or for any of the reasons he states. In fact, since The Jewish Mother's MBAR was not in one of the two batches of MBARs sent to the IRS by ABC, it appears that according to the computer program ABC used to analyze the MBARs, The Jewish Mother's MBAR was not one of the sixteen worst restaurant

MBARs in the Tidewater area in July and September 1993. At best, The Jewish Mother's MBAR could only have been the 17th worst according to the ABC computer program. If agent Ryan's testimony is true, it tends to disprove Dunford's claim that he in fact conducted an analysis in October 1993 of all of Mom's MBARs, since Ryan only requested and received only two MBARs for The Jewish Mother. At the very least, Ryan's testimony supports the conclusion that if Dunford did in fact conduct an analysis in the fall of 1993, he did not find The Jewish Mother's MBARs to be so out of line as to merit forwarding them to the IRS prior to the IRS' request.

Whenever Dunford did conduct an analysis of the MBARs, whether it was in the Fall of 1993 or in March of 1994, that analysis examined only the beer and wine purchases and sales, based on pricing information he obtained not from the ABC agent assigned to the restaurant, but from a Norfolk Police officer—Bennis—who had only visited the restaurant on a social basis. Dunford claims he analyzed the beer and wine figures for the MBARs covering the 1989–1990, 1990–1991, and 1991–1992 reporting periods. However, Dunford did not have any information about the price of wine at the restaurant. The Court questions how one can determine that a restaurant's beer and wine sales are under-reported when one does not have information about the price of wine at the establishment. Moreover, Bennis was not even involved with The Jewish Mother until March 1994. Nevertheless, based on his examination of only the beer figures, Dunford concluded that the Virginia Beach Jewish Mother was under-reporting $500,-000 a year in beer and wine. Moreover, in conducting his analysis, Dunford did not apply what he stated to be the average state-wide wine and beer markup ratio, i.e., 2.6 to 2.8, but rather a markup ratio of four to one. He applied the four to one ratio to the beer pricing information he obtained from Bennis without any pricing information for wine. Furthermore, al-

though he obtained beer pricing information from Bennis, Dunford apparently never asked Bennis about cover charges or the amount of an average bill at The Jewish Mother. Any of these figures would have proved his conclusions to be wrong. Moreover, there is evidence that Dunford did not consider that the mixed beverage figures were overstated according to his averages. He zeroed in on the beer figures alone. A jury could conclude that Dunford made no analysis, but merely a supposition to support the desire to obtain a search warrant which was totally unnecessary to obtain any records.

Aside from the inadequacy of Dunford's MBAR analysis, a jury could find that Dunford gave these reports significance that was not apparent on their face and that he deliberately provided misleading information to Willman. Dunford admitted that prior to hearing Shofner's story, Dunford wanted to arrest Mom's owners for operating at the Colley Avenue location without a license. A jury could conclude that Dunford was eager to use the power and resources of the IRS for his own purposes, and that he provided misleading information to Willman because he wanted to get search warrants for the restaurants and the personal residences in order to teach Bonk, Colaprete, and Miller a lesson, or perhaps, as noted above, to aid Berger in his dealings with the Mom's owners. Such a conclusion is supported by the fact that Dunford decided not to exercise the ABC's regulatory power to enter the restaurants without a search warrant to seize records, even after Shofner told him exactly where Mom's allegedly kept a second set of books. Furthermore, Dunford was a former Norfolk police officer, yet he claims that he did not know that Lineberry, through his company Southern Amusements, had mortgages and interests in or on most of the taverns in Tidewater. A jury could easily disbelieve Dunford's claim that he did not know of Lineberry or Berger's significant involvement in the Tidewater tavern and restaurant business. Dunford and Santana both claim that they did not know that Callahan, Speaker Moss'

law associate, was representing Mom's with regard to the Colley Avenue location. However, a jury could believe that they did know.

A jury could conclude that Dunford intentionally supplied exaggerated and misleading information to Willman for the purpose of obtaining a search warrant. A reasonable officer would know that providing false information to the IRS about potential under-reporting might lead to the issuance of a search warrant without probable cause. Indeed, Willman stated that she relied upon Dunford's representations in reaching her own conclusion that Shofner was credible. (Willman Dep. at 186.) Dunford's claim concerning when he allegedly analyzed the MBARs is doubtful in light of the testimony of Ryan, the involvement of Bennis, and the records themselves. Accordingly, summary judgment is denied with regard to Dunford's claim of immunity and the procurement of the warrants.

*Altman*

■ ABC defendant Altman was Dunford and Kelley's supervisor at the time the searches were conducted. He assigned Dunford and Kelley to assist Willman in any manner she needed. According to Shofner's probation officer, Mary Farashahi, she met with Altman and Bennis after the searches on April 5, 1994. At that time, Altman asked her if Shofner was being treated for being a compulsive liar. Although it is unclear whether Altman asked this question because he had reason to believe Shofner was a liar, or because Farashahi was talking around the subject as Altman claims, it is of no importance. There is no evidence to suggest that Altman had any knowledge prior to the execution of the search warrants that Shofner was a habitual liar or receiving treatment for her affliction.

Furthermore, although Willman testified that in addition to Dunford, Altman was responsible for describing the MBARs to her, (Willman Dep. at 63–64), there is no evidence that Altman actually conducted

an analysis of the MBARs or conveyed the notion to Willman that he had conducted such an analysis. It appears that at worst, Altman merely helped to explain the conclusions that Dunford had supposedly reached with regard to the MBARs. There is insufficient evidence to find that Altman intentionally supplied false information to Willman for the purpose of obtaining a search warrant. Therefore, a reasonable officer in Altman's position may not have believed that he was violating Plaintiffs' constitutional rights by taking the action Altman may have taken in this case. While Altman's explanation to Willman may have been incorrect, there is no evidence to suggest that he knew it to be incorrect, or that he even knew that Dunford and Kelley had conducted a faulty or insufficient analysis. Accordingly, summary judgment is granted with regard to all claims against Altman involving the procurement of the search warrant.

## 2. Alteration of Dogs' Demeanor

Defendants argue that Plaintiffs' claim that the raids and the brief impoundment of Colaprete's dogs altered the dogs' demeanor is essentially a claim for conversion. Defendants also maintain that Plaintiffs failed to comply with the appropriate tort claims act, either state or federal. Plaintiffs attempt to paint this claim as an unconstitutional deprivation of property in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

Plaintiffs, however, have failed to state a constitutional claim in relation to the treatment of the dogs. Although dogs are recognized as property and a cause of action may lie for their injury, *see Sentell v. New Orleans & C.R. Co.*, 166 U.S. 698, 700, 17 S.Ct. 693, 694, 41 L.Ed. 1169 (1897), in this case no constitutional rights have been infringed. Statutes providing for the killing of dogs found without a collar have been upheld as constitutional. *See id.* at 706, 17 S.Ct. at 696. So long as there is a reasonable basis for the injury to the dog, the action will be upheld. *See id.*

■ In this case, the brief impoundment of the dogs was reasonable for the officers' safety during the execution of the warrants. Consequently, no unconstitutional taking of property occurred. Additionally, Colaprete's dogs were returned, so he suffered no permanent deprivation of property. *See Gall v. City of Vidor,* 903 F.Supp. 1062, 1067 (E.D.Tex.1995) (holding that there was no constitutional deprivation of property when dogs were impounded following allegations of animal abuse, but were ultimately returned to the owner). Since Plaintiffs have failed to state a constitutional claim, Defendants are entitled to qualified immunity on this claim.

## 3. Missing Gold Watch

Colaprete claims that when his safe was returned to him his gold watch was missing from inside. Defendants argue that Colaprete's claim about his allegedly missing watch is also essentially a claim for conversion, and that Plaintiffs' sole remedy for tort claims is to seek relief under the appropriate tort claims act, either state or federal. However, the deprivation of property without due process of law during the execution of a search warrant could violate the Fourth, Fifth, and Fourteenth Amendments. The right of an individual not to have a watch stolen during the execution of a search warrant is clearly established and a reasonable officer would have known that theft of the watch would violate Plaintiffs' constitutional due process rights.

■ Neither Willman nor Kast were present during the search of Colaprete's house. (Willman Decl. ¶ 26; Kast Decl. ¶ 12.) However, a question of fact remains as to Willman's potential responsibility for the allegedly missing gold watch, since she examined the contents of the floor safe after the search. (Willman Decl. ¶ 25.) Kast, though, cannot be held responsible for the absence of the watch. Similarly, ABC defendants Santana and Altman cannot be held responsible for the loss of the watch. Neither of them participated in the search of Colaprete's house, (Altman Aff. ¶ 30; Santana Aff. ¶¶ 54–62), and

there are no facts which would suggest they exercised any degree of control over the safe or its contents after it was seized and placed in storage. ABC defendant Dunford, on the other hand, although not present during the search of Colaprete's house, did exercise control over the safe while it was being stored at ABC facilities in Richmond. (Dunford Aff. ¶¶ 36–46.) In fact, he opened the safe, albeit at the direction of an United States Attorney. Moreover, the safe, as well as the other seized records, was in his keeping. Accordingly, he should not be dismissed from this claim. Defendants' assertions that they did not see a man's gold watch during the search does not excuse them from potential liability for its absence. A question of fact remains as to whether the gold watch exists and whether it was taken during the search without due process. A jury must determine all of the questions concerning the watch.

## III. *CONCLUSION*

The Court's initial reaction upon reading the memoranda submitted by the parties was that there might be some evidence upon which all Defendants could be entitled to qualified immunity. But after analyzing the evidence, it is obvious that many misrepresentations and omissions were made in the affidavit submitted to Magistrate Judge Miller in support of the application for the search warrants, and evidence suggests that some of the Defendants who did not sign the affidavit supplied false or misleading information to the affiant. A jury could easily conclude that Defendants acted recklessly, and in some instances, intentionally, to such an extent that a reasonable police officer would or should have known that the constitutional rights of Plaintiffs were being abridged. In the opinion of the Court, it appears that the insistence by a few individuals that some of the plaintiffs were criminals overcame calm analysis and good sense. Even today Defendants persist in believing that what is not, is. The efforts of the Court to ascertain the facts in the record led the Court to believe that Defen-

dants were determined to justify their conclusion that Mom's was under-reporting when the facts showed that it was not. This case is the paramount example of the way people in groups will commit acts that no individual would consider alone and that the final result in this case was a result of the prevailing mob rule that was present in the Richmond ABC offices on March 30 and 31, 1994.

It is interesting to note that before April 1, 1993, several individuals involved in this case did not believe Deborah Shofner: Farashahi, the probation officer; Werle, the Virginia Beach Police Detective; Scheiner, the FBI agent; and D.B. Gray, Mom's CPA. Deborah Shofner had convinced those involved in this case not to contact the Virginia Beach Police; but she did not convince them not to talk to Farashahi or D.B. Gray—they convinced themselves. Nor did the investigators contact Mom's principals, Sullivan Callahan, Mom's attorney and law associate of the then Speaker of the Virginia House of Delegates, or the Norfolk Commonwealth's Attorney, who was investigating Shofner. There was no effort made to ascertain the possible location of the four or five million dollars of alleged skimmed money. It was not in the bank; it was not in wire transfers; it was not in real estate. It was not.

This case raises a host of interesting questions. Why was there no effort made to determine the origin of the handwritten notes supplied by Shofner which allegedly indicated "system shut-off" figures and "cover charges" in excess of $25,000 for a fifteen-day period at this supposedly "mom and pop" operation? Why were Berger and Lineberry able to stop the ABC from taking action? Why was recent graduate and relatively new six-month employee Valarie Kelley assigned to be the individual responsible for analyzing the sales figures provided by Shofner to the ABC? What happened to the handwritten notes from November 9, 1993 through November 23, 1993? The parties provided the Court with handwritten notes from December 1993 only. It is interesting to note that the December 1993 handwritten notes of

receipts do not even contain references to "system shut-off" or large "cover charges." Why were these receipts not analyzed?

Why did the ABC not walk into the Virginia Beach Jewish Mother, go upstairs, and seize the alleged second set of books without a warrant as the ABC was legally entitled to do, instead of having a group of armed agents and officers spend all day hauling away cash registers and escorting customers out? Was this search warrant utilized as a means of punishment or to obtain information? Why did Dunford not talk to Shofner about this matter during the hour and a half to two hour drive from Norfolk to Richmond? Why did the ABC hide Shofner and keep her in protective custody after learning that most of the information she provided was untrue and that she had trouble with the truth to such a degree that she was receiving medical treatment for such? Why was it that Defendants did not want to believe that Shofner was an embezzler? Why was the Court's Order of July 9, 1999 not followed without any adequate explanation as to the lack of records and the failure to provide dates?

It is true that the Mom's principals had a sloppy bookkeeping system, neglected to keep abreast of their affairs, hired a con artist and placed her in a significant position upon which others had to rely. The Mom's principals were also negligent in filing returns and documents of all kinds. Unfortunately Defendants, primarily Dunford and Willman, bought Shofner's story lock, stock, and barrel. They are lucky that the ensuing explosion did not kill.

Did Dunford have an axe to grind with the Mom's principals or with Callahan, who was at the time a law associate of the then Speaker of the Virginia House of Delegates Tom Moss? Is there some reason Dunford wanted the IRS to be the apparent lead agency in this investigation instead of the ABC? All questions of fact must and should be determined not by any one judge, but by a jury after hearing all of the witnesses and considering all of the evidence.

For the reasons stated above, the Court makes the following rulings: Defendants Willman and Kast's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART.** The Motion is granted to the extent that Kast is entitled to judgment with regard to all claims. Willman is entitled to judgment as to the claims by plaintiff Bonk, and the claim regarding Colaprete's dogs. Willman is not entitled to immunity with regard to any other claims. The Motion for Summary Judgment filed by the ABC Defendants is also **GRANTED IN PART** and **DENIED IN PART.** ABC defendants Santana and Altman are entitled to judgment with regard to all claims. ABC defendant Dunford is entitled to judgment with regard to the claim brought by Bonk, and the claim involving Colaprete's dogs. Dunford is not entitled to immunity with regard to any other claims. At this time, there are no other motions pending. The case will proceed on all outstanding issues as to the defendants Willman and Dunford for an eventual jury trial.

The Clerk of the Court is **DIRECTED** to mail a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**